RANDALL R. ALLEN (SBN 264067)
randall.allen@alston.com
PALANI P. RATHINASAMY (SBN 269852)
palani.rathinasamy@alston.com
**ALSTON & BIRD LLP**
275 Middlefield Road, Suite 150
Menlo Park, CA 94025-4008
Telephone:      650-838-2000
Facsimile:      650-838-2001

Attorneys for Defendants
MCDONALD'S CORPORATION and
MCDONALD'S USA, LLC.

ORIGINAL
FILED
E-filing

FEB - 2 2011

RICHARD W. WIEKING
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF California

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SAN FRANCISCO DIVISION

DMR

| | |
|---|---|
| MONET PARHAM, on behalf of herself and those similarly situated,<br><br>    Plaintiff,<br><br>  v.<br><br>McDONALD'S CORPORATION, and McDonald's USA, LLC.,<br><br>    Defendants. | Case No.:   CV11   0511<br><br>**NOTICE OF REMOVAL OF ACTION TO UNITED STATES DISTRICT COURT UNDER 28 U.S.C. § 1332(d) and § 1441(b) [REDACTED COPY]** |

**TO THE CLERK OF THE UNITED STATES DISTRICT COURT, NORTHERN DISTRICT OF CALIFORNIA, AND TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:**

**PLEASE TAKE NOTICE** that defendants McDonald's Corporation and McDonald's USA, LLC (collectively, "McDonald's") hereby remove the above-titled action from the Superior Court of the State of California for the County of San Francisco, where the state court action was filed, to the United States District Court for the Northern District of California.

//

1        In support of this Notice, McDonald's alleges as follows:

2        1.        On December 15, 2010, plaintiff Monet Parham ("Plaintiff") commenced the

3    aforementioned action in state court by filing a complaint ("Complaint") entitled *Monet Parham,*

4    *on behalf of herself and those similarly situated, and her daughter, Maya, a minor through her*

5    *guardian ad litem Monet Parham v. McDonald's Corporation and McDonald's USA, LLC*"

6    bearing San Francisco County Superior Court Case No. CGC-10-506178.  On January 5, 2011,

7    Plaintiff amended her Complaint ("Amended Complaint") to "*Monet Parham, on behalf of herself*

8    *and those similarly situated v. McDonald's Corporation and McDonald's USA, LLC,*" bearing the

9    same case number and court designation.  The Amended Complaint alleges the following three

10   purported causes of action on behalf of Plaintiff and the proposed class: (1) Engaging in Unfair

11   Marketing and Business Practices; (2) Engaging in Unfair Methods of Competition and Unfair or

12   Deceptive Acts or Practices; and (3) Engaging in Unlawful Methods of Competition and Unfair or

13   Deceptive Acts or Practice.  A true and correct copy of the Complaint and Amended Complaint

14   and all other state court pleadings are attached as **Exhibit 1-A** to the concurrently filed

15   Declaration of Palani Rathinasamy ("Rathinasamy Dec.") attached hereto as **Exhibit 1**.

16       2.        Defendant accepted service of the Amended Complaint on January 5. 2011, by

17   agreement with Plaintiff.  [*See* Rathinasamy Dec., Ex. B].  Therefore, this Notice of Removal,

18   filed on February 1, 2011, is timely filed pursuant to 28 U.S.C. §1446(b).

**VENUE**

20       3.        The Northern District is the proper district for the removal of this action pursuant to

21   28 U.S.C. §§ 1441(a), 1446(a), and 84(a).  This action was originally brought in the Superior

22   Court of the State of California for the County of San Francisco bearing San Francisco County

23   Superior Court Case No. CGC-10-506178.

**CAFA JURISDICTION**

25       4.        This is a civil action over which this Court has original jurisdiction, and one in

26   which McDonald's may remove pursuant to the provisions of the Class Action Fairness Act

27   ("CAFA") 28 U.S.C. §§ 1332(d) and 1441(b) to this Court, in that Plaintiff is a citizen of a state

28   different from any defendant, the number of proposed class members exceeds 100 individuals, and

NOTICE OF REMOVAL OF ACTION TO UNITED STATES
DISTRICT COURT UNDER 28 U.S.C. § 1332(d) AND § 1441(b)          2

1    the amount in controversy exceeds the sum of $5,000,000, exclusive of interest and costs. *See* 28

2    U.S.C. § 1332(d)(2); *Carvalho v. Equifax Info. Servs., LLC*, No. 09-15030, 2010 WL 5127974, at

3    *4 (9th Cir. Dec. 16, 2010) (quoting *Lowdermilk v. U.S. Bank Nat'l Ass'n*, 479 F.3d 994, 997 (9th

4    Cir. 2007)).

5        **Plaintiff's Citizenship**

6        5.    At the time of commencement of the state court action and at the time of removal,

7    Plaintiff was, and still is, a citizen of the State of California. *See* Am. Compl. ¶ 27 ("Parham is a

8    parent residing in Sacramento, California").

9        **Defendant's Citizenship**

10       6.    At the time of commencement of the state court action and at the time of removal

11   McDonald's Corporation and McDonald's USA, LLC were, and still are, Delaware corporations,

12   with their principal places of business in the State of Illinois. [Declaration of Peter Sterling

13   ("Sterling Decl."), ¶ 3, filed concurrently herewith and attached as **Exhibit 2**.] Under 28 U.S.C. §

14   1332(c)(1), a corporation is deemed a citizen of "any State by which it has been incorporated and

15   of the State where it has its principal place of business." *See* 28 U.S.C. § 1332(c)(1).

16       7.    McDonald's Corporation and McDonald's USA, LLC are citizens of the State of

17   Delaware pursuant to 28 U.S.C. § 1332(c)(1) because they are corporations incorporated in and

18   organized under the laws of the State of Delaware. [*See* Sterling Decl., ¶ 3.] Both McDonald's

19   entities also are citizens of the State of Illinois, because their principal places of business are in the

20   State of Illinois under the nerve center test. *See Hertz Corp. v. Friend*, 130 S. Ct. 1181, 1192

21   (2010). Specifically, both McDonald's entities' corporate headquarters are located in Oak Brook,

22   Illinois. [*See* Sterling Decl., ¶ 3.]

23       8.    Although Plaintiff misstates that McDonald's is incorporated in both Delaware and

24   Illinois, she effectively acknowledges that Defendants are citizens of a state different from

25   Plaintiff. *See* Am. Compl. ¶ 29 ("Defendants McDonald's Corporation and McDonald's USA,

26   LLC, incorporated in Delaware and Illinois . . .").

27       **Number of Proposed Class Members Exceeds 100**

28       9.    Plaintiff in her Complaint concedes that "[t]he Parents class consists of at least

1   100,000 members." *See* Am. Compl. ¶ 118.

2   **Amount in Controversy Exceeds $5,000,000**

3   (a)  Allegations in the Complaint

4   10.   In the Complaint, Plaintiff asks the court, *inter alia*, to "[d]eclare that McDonald's

5   advertising acts and practices violate the California Unfair Competition Law and the California

6   Consumer Legal Remedies Act," and to "[e]njoin McDonald's from continuing to advertise Happy

7   Meals to California children featuring toys." *See* Am. Compl., Relief Requested ¶ ¶ 2 – 3.

8   Plaintiff also asserts that "the value of the claims to Plaintiff and to the class, and thus the amount

9   in controversy, is far below $75,000.  No matter how evaluated, the amount in controversy falls

10  far short of $5,000,000.00." *Id.* at ¶ 22.

11  (b)  Legal Standard

12  11.   "'In actions seeking declaratory or injunctive relief, it is well established that the

13  amount in controversy is measured by the value of the object of the litigation.'" *Reyes v. Wells*

14  *Fargo Bank, N.A.*, No. C-10-01667 JCS, 2010 WL 2629785, at *4 (N.D. Cal. June 29, 2010)

15  (quoting *Hunt v. Wash. State Apple Adver. Comm'n*, 432 U.S. 333, 347 (1977)).  "In calculating

16  the value of an injunction, the amount in controversy is satisfied if either party can gain or lose the

17  jurisdictional amount." *Mora v. Harley-Davidson Credit Corp.*, No. 1:08-cv-01453 OWW GSA,

18  2009 WL 464465, at *5 (E.D. Cal. Feb. 24 2009) (citing *In re Ford Motor Co.*, 264 F.3d 952, 958

19  (9th Cir. 2001)).  "Under this 'either viewpoint rule' the test for determining the amount in

20  controversy is the pecuniary result to either party which the judgment would directly produce."

21  *Mora*, 2009 WL 464465 at *5 (citing *In re Ford Motor Co.*, 264 F.3d at 958).

22  12.   Since CAFA's passage, California federal courts have held that the "either

23  viewpoint rule" now applies in class actions and that the amount in controversy to be considered

24  where an injunction is sought includes "either the defendant's cost of compliance with an

25  injunction or the plaintiff's benefit from that injunction." *Tompkins v. Basic Res. L.L.*, No. CIV S-

26  08-244 LKK/DAD, 2008 WL 1808316, at *4 (E.D. Cal. Apr. 22, 2008) (citing *In re Ford Co.*, 264

27  F.3d at 958)).  Thus, it is proper for the Court to consider McDonald's aggregate cost of

28  compliance when determining whether it meets the jurisdictional amount. *See Yeroushalmi v.*

1    *Blockbuster, Inc.*, No. CV 05-225-AHM(RCX), 2005 WL 2083008, at *3 n.4 (C.D. Cal. July 11,

2    2005) ("Prior to CAFA, the Ninth Circuit rejected use of the 'either viewpoint rule.' . . . It is clear

3    that CAFA overrules the circuit's position on this point insofar as qualifying class actions are

4    concerned."); *Tompkins*, 2008 WL 1808316, at *4 n.9 ("Now, however, '[i]t is clear that CAFA

5    overrules the circuit's position on this point insofar as qualifying class actions are concerned,'

6    because CAFA explicitly allows aggregation of damages in determining the amount in

7    controversy.") (quoting *Yeroushalmi*, 2005 WL 20083008, at *3 n.4).

8              (c)  McDonald's Total Cost of Compliance

9         13.    As set forth in the Declaration of Peter Sterling filed concurrently herewith,

10   McDonald's total cost of compliance with the prayed for injunction would be ████████

11   [Sterling Dec. ¶ 7]. Specifically, it would cost McDonald's ███████ in television advertising

12   [Sterling Dec. ¶ 31] and ████████ in toy costs [Sterling Dec. ¶ 31] to comply with the prayed

13   for injunction. This amount far exceeds the jurisdictional amount of $5,000,000.[1]

14             (d)  Attorney's Fees

15        14.    "Attorney's fees may be included in the amount in controversy if recoverable by

16   statute or contract." *See Simmons v. PCR Tech.*, 209 F. Supp. 2d 1029, 1034 (N.D. Cal. 2002)

17   (citing *Galt G/S v. JSS Scandinavia*, 142 F.3d 1150, 1555-56 (9th Cir. 1998)); *see also Brady v.*

18   *Mercedes-Benz USA, Inc.*, 243 F. Supp. 2d 1004, 1010 (N.D. Cal 2002). Attorney's fees are

19   recoverable as a matter of right under Plaintiff's California Consumer Legal Remedies Act

20   ("CLRA") claim. *See* Cal. Civ. Code § 1780(e) ("The court shall award court costs and attorney's

21   fees to a prevailing plaintiff in litigation filed pursuant to this section."). Moreover, Plaintiff is

22   specifically seeking attorney's fees in this action. *See* Am. Compl., Relief Requested ¶ 4 ("Award

23   costs and attorney's fees, in an amount to be determined at trial.") In CLRA cases, the awarded

24   attorney's fees can be in the hundreds of thousands of dollars for single plaintiff cases, and over a

25   million dollars in CLRA class actions. [*See* Rathinasamy Dec ¶ 4, **Ex. 1-C**]. Here plaintiff is

26   asking for state-wide injunctive relief and the proposed class numbers more than 100,000

---

27   [1] The costs in this paragraph are proprietary and have been redacted pursuant to McDonald's
28   Administrative Motion to Seal filed herewith.  An unredacted copy has been filed with that
     motion.

1  individuals.  Plaintiff therefore could seek to recover as much as $1 million in fees.[2]

2                                    **CONCLUSION**

3          15.     Based on the foregoing, this Court has jurisdiction over the state court action under

4  the provisions of 28 U.S.C. § 1332(d), in that Plaintiff is a citizen of a state different from any

5  defendant, the number of proposed class members exceeds 100 individuals, and the amount in

6  controversy exceeds the sum of $5,000,000, exclusive of interest and costs.  Accordingly, the state

7  court action is properly removed to this Court pursuant to the provisions of 28 U.S.C. §§ 1441 and

8  1446.

9                             **NOTICE TO STATE COURT**

10         16.     A true and correct copy of the Notice of Removal has been served on the Plaintiff

11  and this redacted version has been filed with the Clerk of the Superior Court of the State of

12  California, County of San Francisco, as required by law.

13  DATED:  February 2, 2011              Respectfully submitted,

14                                        ALSTON & BIRD LLP

15

16                                        By:

17                                           Palani P. Rathinasamy
                                             Attorneys for Defendants
18                                           McDONALD'S CORPORATION and
                                             McDONALD'S USA, LLC

19  LEGAL02/32444399v1

20

21

22

23

24

25

26

27    [2] While Plaintiff could seek to recover $1 million in attorney's fees pursuant to the attached
28  jury verdicts, Defendants reserve the right to challenge any amount that Plaintiff might claim in
    attorney's fees in the future.

# EXHIBIT 1

1  RANDALL R. ALLEN (SBN 264067)
   randall.allen@alston.com
2  PALANI P. RATHINASAMY (SBN 269852)
   palani.rathinasamy@alston.com
3  **ALSTON & BIRD LLP**
   275 Middlefield Road, Suite 150
4  Menlo Park, CA 94025-4008
   Telephone:     650-838-2000
5  Facsimile:      650-838-2001

6  Attorneys for Defendants
   MCDONALD'S CORPORATION and
7  MCDONALD'S USA, LLC.

8

9                    UNITED STATES DISTRICT COURT

10                NORTHERN DISTRICT OF CALIFORNIA

11                    SAN FRANCISCO DIVISION

12

13 MONET PARHAM, on behalf of herself and        Case No.:
   those similarly situated,
14                                               **DECLARATION OF PALANI P.**
                                                 **RATHINASAMY IN SUPPORT OF**
15              Plaintiff,                        **McDONALD'S NOTICE OF REMOVAL**

16         v.

17 McDONALD'S CORPORATION, and
   McDONALD'S USA, LLC.,
18
                Defendants.
19

20

21       I, Palani P. Rathinasamy, declare:

22       1.      I am an attorney at Alston & Bird LLP, attorneys of record for defendants

23 McDonald's Corporation and McDonald's USA, LLC in this action.  I make this Declaration in

24 support of the Notice of Removal.  I have personal knowledge of the following facts and if called

25 as a witness would and could testify competently thereto.

26       2.      Attached hereto, and incorporated herein as though fully set forth at length, as

27 **Exhibit A** to this Declaration are true and correct copies of all of the pleadings filed in *Monet*

28 *Parham et al. v. McDonald's Corporation and McDonald's USA LLC*, San Francisco Superior

1    Court Case No. CGC-10-506178.

2          3.      By agreement of counsel, McDonald's accepted service of the Amended Complaint

3    on January 5, 2011.

4          4.      Attached hereto, and incorporated herein as though fully set forth at length, as

5    **Exhibit B** to this Declaration are true and correct copies of the jury verdicts referenced in the

6    Notice of Removal.

7          I declare under penalty of perjury of the laws of the United States that the foregoing is true

8    and correct.  Executed this 2nd day of February 2011, at Menlo Park, California.

9

10

11

12    LEGAL02/32443576v1                                  Palani P. Rathinasamy

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# EXHIBIT A



## SUPERIOR COURT OF CALIFORNIA
## COUNTY OF SAN FRANCISCO

# Document Scanning Lead Sheet

Dec-15-2010 9:47 am

Case Number: CGC-10-506178

Filing Date: Dec-15-2010 9:28

Juke Box: 001    Image: 03062803

COMPLAINT

IET PARHAM, ON BEHALF OF HERSELF AND THOSE et al VS. MCDONALD'S CORPORA

001C03062803

**Instructions:**
Please place this sheet on top of the document to be scanned.

CM-010

| ATTORNEY OR PARTY WITHOUT ATTORNEY *(Name, State Bar number, and address):* | FOR COURT USE ONLY |
|---|---|

George Richard Baker (SBN 224003)
2229 First Avenue North
The Black Diamond Building
Birmingham, Alabama 35203
TELEPHONE NO.: 205.241.9608    FAX NO.: 205.449.0050
ATTORNEY FOR *(Name):* Monet and Maya Parham and those similarly situated

SUPERIOR COURT OF CALIFORNIA, COUNTY OF  San Francisco
STREET ADDRESS: 400 McAllister Street
MAILING ADDRESS:
CITY AND ZIP CODE: San Fransisco, CA 94102
BRANCH NAME:

CASE NAME:
Monet Parham, et al. vs. McDonald's Corp. et al.

**F I L E D**
Superior Court of California
County of San Francisco

DEC 15 2010

CLERK OF THE COURT

BY: *Param Natt*
                    Deputy Clerk

| CIVIL CASE COVER SHEET | | Complex Case Designation | | CASE NUMBER |
|---|---|---|---|---|
| ☑ Unlimited (Amount demanded exceeds $25,000) | ☐ Limited (Amount demanded is $25,000 or less) | ☐ Counter  ☐ Joinder Filed with first appearance by defendant (Cal. Rules of Court, rule 3.402) | C G C | **- 1 0 - 5 0 6 1 7 8** |
| | | | | JUDGE: |
| | | | | DEPT: |

*Items 1–6 below must be completed (see instructions on page 2).*

1. Check one box below for the case type that best describes this case:

**Auto Tort**
- ☐ Auto (22)
- ☐ Uninsured motorist (46)

**Other PI/PD/WD (Personal Injury/Property Damage/Wrongful Death) Tort**
- ☐ Asbestos (04)
- ☐ Product liability (24)
- ☐ Medical malpractice (45)
- ☐ Other PI/PD/WD (23)

**Non-PI/PD/WD (Other) Tort**
- ☑ Business tort/unfair business practice (07)
- ☐ Civil rights (08)
- ☐ Defamation (13)
- ☐ Fraud (16)
- ☐ Intellectual property (19)
- ☐ Professional negligence (25)
- ☐ Other non-PI/PD/WD tort (35)

**Employment**
- ☐ Wrongful termination (36)
- ☐ Other employment (15)

**Contract**
- ☐ Breach of contract/warranty (06)
- ☐ Rule 3.740 collections (09)
- ☐ Other collections (09)
- ☐ Insurance coverage (18)
- ☐ Other contract (37)

**Real Property**
- ☐ Eminent domain/Inverse condemnation (14)
- ☐ Wrongful eviction (33)
- ☐ Other real property (26)

**Unlawful Detainer**
- ☐ Commercial (31)
- ☐ Residential (32)
- ☐ Drugs (38)

**Judicial Review**
- ☐ Asset forfeiture (05)
- ☐ Petition re: arbitration award (11)
- ☐ Writ of mandate (02)
- ☐ Other judicial review (39)

**Provisionally Complex Civil Litigation (Cal. Rules of Court, rules 3.400–3.403)**
- ☐ Antitrust/Trade regulation (03)
- ☐ Construction defect (10)
- ☐ Mass tort (40)
- ☐ Securities litigation (28)
- ☐ Environmental/Toxic tort (30)
- ☐ Insurance coverage claims arising from the above listed provisionally complex case types (41)

**Enforcement of Judgment**
- ☐ Enforcement of judgment (20)

**Miscellaneous Civil Complaint**
- ☐ RICO (27)
- ☐ Other complaint *(not specified above)* (42)

**Miscellaneous Civil Petition**
- ☐ Partnership and corporate governance (21)
- ☐ Other petition *(not specified above)* (43)

2. This case ☐ is ☑ is not complex under rule 3.400 of the California Rules of Court. If the case is complex, mark the factors requiring exceptional judicial management:
   a. ☐ Large number of separately represented parties
   b. ☐ Extensive motion practice raising difficult or novel issues that will be time-consuming to resolve
   c. ☐ Substantial amount of documentary evidence
   d. ☐ Large number of witnesses
   e. ☐ Coordination with related actions pending in one or more courts in other counties, states, or countries, or in a federal court
   f. ☐ Substantial postjudgment judicial supervision

3. Remedies sought *(check all that apply):* a. ☐ monetary    b. ☑ nonmonetary; declaratory or injunctive relief    c. ☐ punitive
4. Number of causes of action *(specify):*  Three
5. This case ☑ is ☐ is not a class action suit.
6. If there are any known related cases, file and serve a notice of related case. *(You may use form CM-015.)*

Date:  December 15, 2010
George Richard Baker
_____
(TYPE OR PRINT NAME)                              (SIGNATURE OF PARTY OR ATTORNEY FOR PARTY)

**BY FAX**

**NOTICE**
- Plaintiff must file this cover sheet with the first paper filed in the action or proceeding (except small claims cases or cases filed under the Probate Code, Family Code, or Welfare and Institutions Code). (Cal. Rules of Court, rule 3.220.) Failure to file may result in sanctions.
- File this cover sheet in addition to any cover sheet required by local court rule.
- If this case is complex under rule 3.400 et seq. of the California Rules of Court, you must serve a copy of this cover sheet on all other parties to the action or proceeding.
- Unless this is a collections case under rule 3.740 or a complex case, this cover sheet will be used for statistical purposes only.

| Form Adopted for Mandatory Use Judicial Council of California CM-010 [Rev. July 1, 2007] | **CIVIL CASE COVER SHEET** | Cal. Rules of Court, rules 2.30, 3.220, 3.400–3.403, 3.740; Cal. Standards of Judicial Administration, std. 3.10 www.courtinfo.ca.gov |
|---|---|---|

Page 1 of 2

## INSTRUCTIONS ON HOW TO COMPLETE THE COVER SHEET

CM-010

**To Plaintiffs and Others Filing First Papers.** If you are filing a first paper (for example, a complaint) in a civil case, you **must** complete and file, along with your first paper, the *Civil Case Cover Sheet* contained on page 1. This information will be used to compile statistics about the types and numbers of cases filed. You must complete items 1 through 6 on the sheet. In item 1, you must check **one** box for the case type that best describes the case. If the case fits both a general and a more specific type of case listed in item 1, check the more specific one. If the case has multiple causes of action, check the box that best indicates the **primary** cause of action. To assist you in completing the sheet, examples of the cases that belong under each case type in item 1 are provided below. A cover sheet must be filed only with your initial paper. Failure to file a cover sheet with the first paper filed in a civil case may subject a party, its counsel, or both to sanctions under rules 2.30 and 3.220 of the California Rules of Court.

**To Parties in Rule 3.740 Collections Cases.** A "collections case" under rule 3.740 is defined as an action for recovery of money owed in a sum stated to be certain that is not more than $25,000, exclusive of interest and attorney's fees, arising from a transaction in which property, services, or money was acquired on credit. A collections case does not include an action seeking the following: (1) tort damages, (2) punitive damages, (3) recovery of real property, (4) recovery of personal property, or (5) a prejudgment writ of attachment. The identification of a case as a rule 3.740 collections case on this form means that it will be exempt from the general time-for-service requirements and case management rules, unless a defendant files a responsive pleading. A rule 3.740 collections case will be subject to the requirements for service and obtaining a judgment in rule 3.740.

**To Parties in Complex Cases.** In complex cases only, parties must also use the *Civil Case Cover Sheet* to designate whether the case is complex. If a plaintiff believes the case is complex under rule 3.400 of the California Rules of Court, this must be indicated by completing the appropriate boxes in items 1 and 2. If a plaintiff designates a case as complex, the cover sheet must be served with the complaint on all parties to the action. A defendant may file and serve no later than the time of its first appearance a joinder in the plaintiff's designation, a counter-designation that the case is not complex, or, if the plaintiff has made no designation, a designation that the case is complex.

### CASE TYPES AND EXAMPLES

**Auto Tort**
Auto (22)–Personal Injury/Property
    Damage/Wrongful Death
Uninsured Motorist (46) *(if the*
    *case involves an uninsured*
    *motorist claim subject to*
    *arbitration, check this item*
    *instead of Auto)*
**Other PI/PD/WD (Personal Injury/**
**Property Damage/Wrongful Death)**
**Tort**
Asbestos (04)
    Asbestos Property Damage
    Asbestos Personal Injury/
        Wrongful Death
Product Liability *(not asbestos or*
    *toxic/environmental)* (24)
Medical Malpractice (45)
    Medical Malpractice–
        Physicians & Surgeons
    Other Professional Health Care
        Malpractice
Other PI/PD/WD (23)
    Premises Liability (e.g., slip
        and fall)
    Intentional Bodily Injury/PD/WD
        (e.g., assault, vandalism)
    Intentional Infliction of
        Emotional Distress
    Negligent Infliction of
        Emotional Distress
    Other PI/PD/WD
**Non-PI/PD/WD (Other) Tort**
Business Tort/Unfair Business
    Practice (07)
Civil Rights (e.g., discrimination,
    false arrest) *(not civil*
    *harassment)* (08)
Defamation (e.g., slander, libel)
    (13)
Fraud (16)
Intellectual Property (19)
Professional Negligence (25)
    Legal Malpractice
    Other Professional Malpractice
        *(not medical or legal)*
    Other Non-PI/PD/WD Tort (35)
**Employment**
Wrongful Termination (36)
Other Employment (15)

**Contract**
Breach of Contract/Warranty (06)
    Breach of Rental/Lease
        Contract *(not unlawful detainer*
            *or wrongful eviction)*
    Contract/Warranty Breach–Seller
        Plaintiff *(not fraud or negligence)*
    Negligent Breach of Contract/
        Warranty
    Other Breach of Contract/Warranty
Collections (e.g., money owed, open
    book accounts) (09)
    Collection Case–Seller Plaintiff
    Other Promissory Note/Collections
        Case
Insurance Coverage *(not provisionally*
    *complex)* (18)
    Auto Subrogation
    Other Coverage
Other Contract (37)
    Contractual Fraud
    Other Contract Dispute
**Real Property**
Eminent Domain/Inverse
    Condemnation (14)
Wrongful Eviction (33)
Other Real Property (e.g., quiet title) (26)
    Writ of Possession of Real Property
    Mortgage Foreclosure
    Quiet Title
    Other Real Property *(not eminent*
        *domain, landlord/tenant, or*
        *foreclosure)*
**Unlawful Detainer**
Commercial (31)
Residential (32)
Drugs (38) *(if the case involves illegal*
    *drugs, check this item; otherwise,*
    *report as Commercial or Residential)*
**Judicial Review**
Asset Forfeiture (05)
Petition Re: Arbitration Award (11)
Writ of Mandate (02)
    Writ–Administrative Mandamus
    Writ–Mandamus on Limited Court
        Case Matter
    Writ–Other Limited Court Case
        Review
Other Judicial Review (39)
    Review of Health Officer Order
    Notice of Appeal–Labor
        Commissioner Appeals

**Provisionally Complex Civil Litigation (Cal.**
**Rules of Court Rules 3.400–3.403)**
Antitrust/Trade Regulation (03)
Construction Defect (10)
Claims Involving Mass Tort (40)
Securities Litigation (28)
Environmental/Toxic Tort (30)
Insurance Coverage Claims
    *(arising from provisionally complex*
    *case type listed above)* (41)
**Enforcement of Judgment**
Enforcement of Judgment (20)
    Abstract of Judgment (Out of
        County)
    Confession of Judgment *(non-*
        *domestic relations)*
    Sister State Judgment
    Administrative Agency Award
        *(not unpaid taxes)*
    Petition/Certification of Entry of
        Judgment on Unpaid Taxes
    Other Enforcement of Judgment
        Case
**Miscellaneous Civil Complaint**
RICO (27)
Other Complaint *(not specified*
    *above)* (42)
    Declaratory Relief Only
    Injunctive Relief Only *(non-*
        *harassment)*
    Mechanics Lien
    Other Commercial Complaint
        Case *(non-tort/non-complex)*
    Other Civil Complaint
        *(non-tort/non-complex)*
**Miscellaneous Civil Petition**
Partnership and Corporate
    Governance (21)
Other Petition *(not specified*
    *above)* (43)
    Civil Harassment
    Workplace Violence
    Elder/Dependent Adult
        Abuse
    Election Contest
    Petition for Name Change
    Petition for Relief From Late
        Claim
    Other Civil Petition

**CIVIL CASE COVER SHEET**

George Richard Baker, Esquire (SBN 224003)
Baker Law, P.C.
2229 1st Avenue North
Birmingham, AL 35203
205.241.9608 (telephone)
205.449.0050 (facsimile)

Stephen Gardner, Esquire (*pro hac vice* pending)
Seema Rattan, Esquire (*pro hac vice* pending)
Center for Science in the Public Interest
5646 Milton Street, Suite 211
Dallas, TX 75206
214.827.2774 (telephone)
214.827.2787 (facsimile)

*Attorneys for Plaintiffs*

**F I L E D**

Superior Court of California
County of San Francisco

DEC 15 2010

CLERK OF THE COURT
BY: Paramo Noll
                Deputy Clerk

CASE MANAGEMENT CONFERENCE SET

MAY 20 2011  9:00 AM

DEPARTMENT 212

## SUPERIOR COURT OF THE STATE OF CALIFORNIA

## IN AND FOR SAN FRANCISCO COUNTY

C G C - 1 0 - 5 0 6 1 7 8

MONET PARHAM, on behalf of herself
and those similarly situated, and her
daughter, MAYA, a minor through her
guardian ad Litem Monet Parham

                    Plaintiffs,

        vs.

McDONALD'S CORPORATION and
McDONALD'S USA, LLC,

                    Defendants.

CASE NO.:

**CLASS ACTION COMPLAINT FOR
VIOLATIONS OF THE UNFAIR
COMPETITION LAW, THE
CONSUMERS LEGAL REMEDIES ACT
AND DECLARATORY AND
INJUNCTIVE RELIEF**

Plaintiffs Request Jury Trial on all Issues
Triable by a Jury

# BY FAX

## INTRODUCTION

1.     Plaintiffs, by and through undersigned counsel, bring this class action

both on their own behalf and on behalf of the classes comprised of all other individuals

similarly situated within the State of California, pursuant to California's Unfair

Competition Law, Business and Professions Code §§ 17200 *et seq.* ("UCL"), and

California's False Advertising Law, Business and Professions Code § 17500, *et seq.*

("FAL"), and The Consumers Legal Remedies Act Civil Code § 1750, *et seq.* ("CLRA")

against McDonald's. Plaintiffs assert that Defendants engage in the unfair, unlawful,

CLASS ACTION COMPLAINT FOR VIOLATIONS OF
THE UNFAIR COMPETITION LAW, THE
CONSUMERS LEGAL REMEDIES ACT AND
DECLARATORY AND INJUNCTIVE RELIEF

1

1   deceptive and fraudulent practice of promoting and advertising McDonald's Happy

2   Meal products to very young California children, using the inducement of various toys.

3        2.    McDonald's exploits very young California children and harms their

4   health by advertising unhealthy Happy Meals with toys directly to them. Children eight

5   years old and younger do not have the cognitive skills and the developmental maturity

6   to understand the persuasive intent of marketing and advertising.

7        3.    Thus, McDonald's advertising featuring toys to bait children violates

8   California law because it is inherently deceptive and unfair.

9        4.    McDonald's advertising is also unfair to its competitors, who do not

10   choose to attract very young children with the lure of a toy.

11        5.    According to the Institute of Medicine, "Before a certain age, children lack

12   the defenses, or skills, to discriminate commercial from noncommercial content, or to

13   attribute persuasive intent to advertising. Children generally develop these skills at

14   about age 8 years, but children as old as 11 may not activate their defenses unless

15   explicitly cued to do so."[1]

16        6.    The United States Supreme Court noted this year that children "have lack

17   of maturity and an underdeveloped sense of responsibility; they are *more vulnerable or*

18   *susceptible to negative influences and outside pressures,* including peer pressure; and

19   their characters are not as well formed."[2]

20        7.    Federal law has a long history of recognizing that advertising that is not

21   understood to be advertising is misleading to consumers, and intervening to prevent

22

23

24

---

25   [1]    INSTITUTE OF MEDICINE, FOOD, MARKETING TO CHILDREN: THREAT OR

26   OPPORTUNITY? ES-4 (National Academics Press 2006).

     [2]    *Graham v. Florida,* 130 S.Ct. 2011, 2026-2027 (2010) (emphasis added; internal

27   quotations and citations omitted). The Court was speaking of teenagers, but the

28   comments apply with even more force to younger children.

                             **CLASS ACTION COMPLAINT FOR VIOLATIONS OF**
                                  **THE UNFAIR COMPETITION LAW, THE**
                                **CONSUMERS LEGAL REMEDIES ACT AND**
                            **DECLARATORY AND INJUNCTIVE RELIEF**

1    deception.[3] "These laws all stem from the principle that the public is entitled to know

2    when and by whom it is being persuaded."[4]

3         8.     Children under the age of eight do not understand advertising; they lack

4    the ability to perceive its persuasive intent. When exposed to advertising, children

5    under eight lack the skills to know when and by whom they are being persuaded.

6         9.     Children nonetheless influence the purchasing decisions of their parents.

7    McDonald's exploits that influence, by bombarding children with advertisements for

8    Happy Meals with toys, knowing that it will result in kids nagging parents to purchase

9    nutritionally poor Happy Meals for their children.

10        10.    Internal McDonald's documents prove its intent to subvert parental

11   authority. One internal document says that "[r]esearch shows when families with kids

12   visit McDonald's, the kids alone decide on McDonald's in 53% of the cases ...[o]n all,

13   they [children] influence 95% of family visits to McDonald's."[5] McDonald's thus

14   affirmatively and knowingly targets the most vulnerable class of consumers, very

15   young children, in order to insidiously and deceptively access parents' wallets.

16        11.    The Federal Trade Commission reported to the President that

17   "[m]arketing directly to children essentially is an end-run" around the parents' role,

18   and should be stopped.[6]

19

20

21   [3]     See e.g. 47 U.S.C. § 317.

22   [4]     Richard Kielbowicz and Linda Lawson, *Unmasking Hidden Commercials in*

23   *Broadcasting: Origins of the Sponsorship Identification Regulations*, 1927-1963, 56 Federal
     Communications Law Journal 327, 330 (2004).

24   [5]     Source: *McDonald's OPNAD Newsletter*, a "publication for McDonald's

25   owner/operators.

     [6]     Federal Trade Commission, "Marketing Violent Entertainment to Children: A

26   Review of Self-Regulation and Industry Practices in the Motion Picture, Music
     Recording & Electronic Game Industries" at 54 (2000). Although this comment was in

27   the context of a different form of different form of harmful marketing practices, the
     finding applies equally here. The report is available at www.ftc.gov/reports/violence/

28   vioreport.pdf.

                    CLASS ACTION COMPLAINT FOR VIOLATIONS OF
                     THE UNFAIR COMPETITION LAW, THE
                    CONSUMERS LEGAL REMEDIES ACT AND
                    DECLARATORY AND INJUNCTIVE RELIEF

                                    3

12.     The White House Task Force on Childhood Obesity has stated that restaurants "have an important role to play in creating a food marketing environment that supports, rather than undermines, the efforts of parents and other caregivers to encourage healthy eating among children and prevent obesity."[7]

13.     Experts, including the American Psychological Association, agree with the FTC's and the White House Task Force's position.

14.     By advertising that Happy Meals include toys, McDonald's has helped create, and continues to exacerbate, a super-sized health crisis in California. Increasing numbers of children are making poor nutritional choices, developing unhealthy eating habits that will follow them into adulthood, and becoming obese.

15.     Most Happy Meals are too high in calories, saturated fat, and sodium to be healthful for very young children. Most Happy Meals lack healthful servings of fruits and vegetables and have little dietary fiber and whole grains. According to the Institute of Medicine, "Diets that are high in calories and other constituents such as saturated fats and low in certain nutrients are putting our children and youth at risk for diseases later in life, such as heart disease, stroke, circulatory problems, some cancers, diabetes, and osteoporosis."[8]

16.     Advertising poor-nutrition Happy Meals with toys to children is a contributing factor in this crisis.

17.     These marketing practices are unfair to parents as well as their children because they interfere with the parents' ability to instill good eating habits in their children and because they cause conflict between parents and their children.

18.     McDonald's is engaged in a highly sophisticated scheme to use the bait of toys to exploit children's developmental immaturity and subvert parental authority.

---

[7]     White House Task Force on Childhood Obesity (2010). "Solving the problem of childhood obesity within a generation." Available at www.letsmove.gov/tfco_fullreport_may2010.pdf.

[8]     INSTITUTE OF MEDICINE, FOOD MARKETING TO CHILDREN: THREAT OR OPPORTUNITY? E-1 (National Academies Press 2006).

CLASS ACTION COMPLAINT FOR VIOLATIONS OF
THE UNFAIR COMPETITION LAW, THE
CONSUMERS LEGAL REMEDIES ACT AND
DECLARATORY AND INJUNCTIVE RELIEF

4

1   That scheme is designed to sell and get children to eat nutritionally unbalanced Happy

2   Meals, which in turn promote obesity and other diet-related diseases. McDonald's

3   advertising of Happy Meals with toys is deceptive and unfair to children, unfair to

4   parents, and in violation of California law. For these reasons, plaintiffs seek the relief set

5   forth herein.

### JURISDICTION AND VENUE

7   19.    This Court has jurisdiction over Plaintiffs' claims.

8   20.    The claims made by the Plaintiffs on behalf of themselves and other

9   members of the Class they purport to represent are brought pursuant to the UCL, the

10  FAL and the CLRA for injunctive relief but not for restitution, penalties, or damages.

11  Thus, the value of the claims to plaintiffs and to the class, and thus the amount in

12  controversy, is far below $75,000. No matter how evaluated, the amount in controversy

13  falls far short of $5,000,000.00. Accordingly, plaintiffs could not elect to bring this case in

14  federal court because there is an insufficient amount in controversy to evoke federal

15  jurisdiction.

16  21.    The jurisdiction and venue of this action in the Superior Court in and for

17  the County of San Francisco is based upon California Code of Civil Procedure § 410.10.

18  22.    Venue is appropriate in the County of San Francisco pursuant to

19  California Code of Civil Procedure § 395. Venue in this Court is proper in that

20  McDonald's transacted business in California and the conduct complained of occurred

21  in California.

22  23.    Plaintiff files her affidavit showing these facts concurrently with the

23  Complaint as required by CC § 1780(c).

### CONDITIONS PRECEDENT

24  24.    All conditions precedent have been performed or have occurred.

**CLASS ACTION COMPLAINT FOR VIOLATIONS OF
THE UNFAIR COMPETITION LAW, THE
CONSUMERS LEGAL REMEDIES ACT AND
DECLARATORY AND INJUNCTIVE RELIEF**

## PARTIES

25.     Monet Parham ("Parham") is a parent residing in Sacramento, California, with children ages two and six. Parham brings this action on her own behalf and as next friend to Maya.

26.     Parham's daughter Maya, age six lives with her mother, father, and sister.

27.     Plaintiffs have standing to bring this case on their own behalf because they have jointly lost money or property because of Defendants' activities, and therefore have suffered an "injury in fact."

28.     Defendants McDonald's Corporation and McDonald's USA, LLC (collectively "McDonald's"), incorporated in Delaware and Illinois, respectively, own and operate the largest and most successful fast food chain in history.

## FACTS

I.     **Definitions**

29.     The term "advertising" includes all forms of marketing in all forms of media and venues, including without limitation: print advertisements, television and radio commercials, product labels, magazines, use of licensed characters, use of celebrities, viral marketing, web sites, signage at restaurants, toys, advergaming, sponsorships, school-based marketing (such as book covers and sponsored educational material), and kids clubs.

30.     "Class Period" is the period from December 15, 2006 and to the date of class certification, or as otherwise determined by the Court.

31.     "Happy Meals" are the meals that McDonald's produces for, and markets directly to, very young children and that are accompanied by a free toy.

32.     Unless otherwise stated, all references to "children" in this complaint means California-resident children eight years or younger.

CLASS ACTION COMPLAINT FOR VIOLATIONS OF
THE UNFAIR COMPETITION LAW, THE
CONSUMERS LEGAL REMEDIES ACT AND
DECLARATORY AND INJUNCTIVE RELIEF

6

## II. Background: A Children's Health Crisis of Epidemic Proportions

33. Increasing numbers of children in California are unhealthy. Many children are becoming overweight or obese and are suffering from diet-related health problems, like diabetes.[9] High-sodium diets boost blood pressure, even in very young children, and saturated fat and cholesterol start clogging arteries in children and youths.

34. Diet-related health problems persist into adulthood. The eating habits and attitudes about nutrition that children adopt often extend into adulthood.[10]

35. Currently, 73% of adults are overweight, obese, or extremely obese.[11] A growing number of children are overweight, obese, or suffer from diet-related health problems, which is an indication that the number of adults with these problems will likely grow. This will further burden California's health-care system, which is already overwhelmed.[12]

36. In California, an increased number of children have poor diets, due in significant part to poor-nutrition foods such as Happy Meals. Happy Meals and other poor-nutrition foods often replace healthier foods and beverages in children's diets and accustom children to seeking and eating poor-nutrition foods even outside the fast-food-restaurant venue. For example, only 2% of children eat a healthy diet consistent with the main dietary recommendations of the U.S. Department of Agriculture.[13] Only

---

[9] INSTITUTE OF MEDICINE, FOOD MARKETING TO CHILDREN: THREAT OR OPPORTUNITY? 2-4 (National Academies Press 2006).

[10] INSTITUTE OF MEDICINE, FOOD MARKETING TO CHILDREN: THREAT OR OPPORTUNITY? E-1 (National Academies Press 2006).

[11] Results from the 2005-2006 National Health and Nutrition Examination Survey (NHANES) available at www.cdc.gov/nchs/data/hestat/overweight/overweight_adult.htm.

[12] INSTITUTE OF MEDICINE, FOOD MARKETING TO CHILDREN: THREAT OR OPPORTUNITY? 5-28 (National Academies Press 2006).

[13] K. Munoz, S. Krebs-Smith, R. Ballard-Barbash and L. Cleveland, *Food Intakes of U.S. Children and Adolescents Compared with Recommendations*, 100 PEDIATRICS 323 (1997).

CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE UNFAIR COMPETITION LAW, THE CONSUMERS LEGAL REMEDIES ACT AND DECLARATORY AND INJUNCTIVE RELIEF

7

1  6% of children meet the USDA recommended limit of saturated fat intake; only 30% of

2  children consume the USDA-recommended number of servings of milk each day; and

3  only 15% eat the daily recommendation of fruit.[11]

4      37.    The great majority of Happy Meals sold in California harm children's

5  diets, and do not provide the nutrients required for healthy growth and development.

6  Consumption of poor-nutrition food such as the contents of Happy Meals contributes to

7  the development of obesity, high blood pressure, diabetes, and obesity-related illnesses

8  in children. Even if children consume healthy foods at other times, consumption of

9  Happy Meals is harmful.

10  **III.**    **Advertising Happy Meals with Toys to Children is Unfair & Deceptive**

11      **A.**    **Targeting Children**

12      38.    Most California children have no concept of what it means to eat a healthy

13  diet.

14      39.    Children rely on outside sources, including parents, friends, and the

15  media, full of powerful advertisements for poor-nutrition Happy Meals, to influence or

16  determine what they should eat.[15]

17      40.    "Food and beverage marketing practices geared to children and youth are

18  out of balance with healthful diets, and contribute to an environment that puts their

19  health at risk."[16]

20      41.    The marketing of poor-nutrition Happy Meals to California children

21  contributes to their desire to consume and request these products. This type of

22

23

24  [14]    U.S. Department of Agriculture, Office of Analysis, Nutrition and Evaluation.

25  CHANGES IN CHILDREN'S DIETS: 1989-1991 to 1994-1996 (USDA 2001).

26  [15]    INSTITUTE OF MEDICINE, FOOD MARKETING TO CHILDREN: THREAT OR OPPORTUNITY? 5-28 (National Academies Press 2006).

27  [16]    Dale Kunkel & Jessica Castonguay, *Children and Advertising: Content,*

28  *Comprehension, and Consequences,* in HANDBOOK OF CHILDREN AND THE MEDIA, 2ND ED. at 36 (Dorothy Singer and Jerome Singer eds., Thousand Oaks, CA: Sage) (forthcoming).

CLASS ACTION COMPLAINT FOR VIOLATIONS OF<br>THE UNFAIR COMPETITION LAW, THE<br>CONSUMERS LEGAL REMEDIES ACT AND<br>DECLARATORY AND INJUNCTIVE RELIEF

1    marketing affects children's short-term and long-term dietary intakes and their

2    attitudes about nutrition.[17]

3        42.    The marketing of poor-nutrition Happy Meals to children in California is

4    pervasive, with over 1300 McDonald's restaurants in California alone.

5        43.    McDonald's markets poor-nutrition Happy Meals to California children

6    through television advertisements, store signage, billboards, Web sites, branded

7    merchandise, product packaging, magazines, and in schools and other venues.

8        44.    Companies – with McDonald's as one of the leaders – employ a myriad of

9    methods to determine what children prefer, how to make children like their products,

10   and how to formulate their products, so they appeal almost irresistibly to children.

11   These methods include: conducting consumer studies, observing children playing and

12   using various products in their homes and schools, and using children as informants on

13   what other children like and do not like.[18]

14       45.    "Total U.S. expenditures on marketing to children are estimated at $15-17

15   billion. It is hard to imagine (and certainly difficult to estimate) the total economic

16   stakes involved for businesses that depend upon child purchases and child influence on

17   parental spending."[19]

18       46.    After studying the effect of marketing on children, the American

19   Psychological Association (APA) issued a report on the issue. That report found,

20   "Because young children lack the cognitive skills and abilities of older children and

21   adults, they do not comprehend commercial messages in the same way as do more

22   mature audiences, and, hence, are uniquely susceptible to advertising influence. A

23

24   [17]    INSTITUTE OF MEDICINE, FOOD MARKETING TO CHILDREN: THREAT OR OPPORTUNITY?

25   5-35-38 (National Academies Press 2006).

     [18]    JULIET B. SCHOR, BORN TO BUY, 120-122 (Scribner 2004).

26
     [19]    Dale Kunkel & Jessica Castonguay, *Children and Advertising: Content,*

27   *Comprehension, and Consequences,* in HANDBOOK OF CHILDREN AND THE MEDIA, 2ND ED. at
     36-37 (Dorothy Singer and Jerome Singer eds., Thousand Oaks, CA: Sage)

28   (forthcoming).

                          CLASS ACTION COMPLAINT FOR VIOLATIONS OF
                             THE UNFAIR COMPETITION LAW, THE
                            CONSUMERS LEGAL REMEDIES ACT AND
                          DECLARATORY AND INJUNCTIVE RELIEF

1    substantial body of research evidence documents age-related differences in how

2    children understand and are affected by television advertising. This evidence has

3    formed the basis for a wide range of policies in the United States designed to protect

4    children from advertising the foundation of a broad societal consensus that children

5    require special treatment and protection from the unbridled efforts of the economic

6    marketplace."[20]

7        47.    The APA also noted, "An important side effect of the influence of

8    advertising on children's desire for products is the parent-child conflict that emerges

9    when refusals occur in response to children's purchase-influence attempts. Parents

10    obviously cannot honor all purchase requests triggered by television advertising, given

11    the volume of commercials that the average child sees. In one study, more than half of

12    children reported arguing or becoming angry when a toy request was denied; in

13    another, the study observed high rates of child disappointment and anger in response

14    to the majority of parent refusals for cereal requests at the supermarket. Other studies

15    confirm these patterns. In sum, the frequent purchase requests associated with

16    children's advertising exposure may place a strain on parent-child interaction.[21]

17        48.    Professor Juliet Schor, a noted expert on consumerism, economics, and

18    family studies, discusses the tension between the responsibilities of parents to make

19    efforts to guide their children's eating practices and the efforts of marketers to

20    undermine those very efforts. She notes that "a major thrust of contemporary marketing

21    to children is the interposition of the marketer between the parent and child. Marketers

22

23

24

25    [20]    American Psychological Association, REPORT OF THE APA TASK FORCE ON

26    ADVERTISING AND CHILDREN at 1 (2004), available at www.apa.org/pi/families/
resources/advertising-children.pdf (internal citations omitted).

27    [21]    American Psychological Association, REPORT OF THE APA TASK FORCE ON

28    ADVERTISING AND CHILDREN at 11 (2004), available at www.apa.org/pi/families/
resources/advertising-children.pdf (internal citations omitted).

CLASS ACTION COMPLAINT FOR VIOLATIONS OF
THE UNFAIR COMPETITION LAW, THE
CONSUMERS LEGAL REMEDIES ACT AND
DECLARATORY AND INJUNCTIVE RELIEF

1    create utopian spaces free of parents and employ insidious dual-messaging strategies.

2    Ads position the marketer with the child against the parent".[22]

3        49.    Professor Schor continues by noting "the undeniable fact of parental

4    responsibility does not imply that it's only parents who should be held responsible. The

5    complexities of life today render that approach far too simple-minded."[23]

6        50.    Thus, the toy may appear to be "free," but consuming these meals has a

7    high actual health cost.

8        51.    Moreover, according to Roy Bergold, who served as McDonald's

9    advertising head for twenty-nine years, "the toys usually aren't free—they're priced

10    into the meal and companies have found that kids are a lot more tempted by the toys

11    than the food."[24]

12        52.    For all of these reasons, McDonald's unfair and deceptive practice of

13    advertising Happy Meals to children by using the lure of a toy directly and proximately

14    inculcate poor dietary habits in California children, placing them at a lifelong risk of

15    developing a myriad of health problems.

16        53.    This in turn contributes to the rising cost of health care in this country.

17        54.    This marketing also interferes with and undermines parental control over

18    the health and welfare of their children. This action seeks to stop one of the most

19    powerful, unfair, and deceptive practices – tempting kids with toys to get them to nag

20    their parents to buy Happy Meals, thereby restoring an environment in which children

21    and their parents can make dietary choices free from unfair and deceptive child-

22    targeted marketing.

---

[22]    J. Schor, BORN TO BUY at 161-162 (Scribner 2004).

[23]    J. Schor, BORN TO BUY at 184 (Scribner 2004).

[24]    Bergold, Jr., Roy T. *"The Obesity Debate."* QSR Magazine 2 November 2010: n. pag. Web. 2 November 2010, *available at* www.qsrmagazine.com/articles/columnist/roy_bergold/1110/obesity-1.phtml.

CLASS ACTION COMPLAINT FOR VIOLATIONS OF
THE UNFAIR COMPETITION LAW, THE
CONSUMERS LEGAL REMEDIES ACT AND
DECLARATORY AND INJUNCTIVE RELIEF

55.     Fast-food companies – with McDonald's by far in the lead – spent over $520 million on marketing and sales promotions, including toys, to advertise children's meals.[25] Toy premiums made up almost three-quarters of those expenses, totaling over $350 million. According to data from the NPD Group, fast food restaurants sold more than 1.2 billion children's meals with toys to children ages 12 and under, accounting for 20% of all child traffic at those restaurants.[26] On information and belief, McDonald's spends far more and distributes far more toys (along with poor-nutrition meals) than any other fast food restaurant.

56.     McDonald's intent is clear, but internal documents make the intent even clearer.

57.     One internal McDonald's document brags that "The ultimate goal is to make McDonald's the overwhelming favorite restaurant to visit for adults, *just as it already is for kids.*"[27]

58.     Another internal document is more specific: "McDonald's has strong appeal among children *because of Happy Meals including fun toys, games, and prizes.* McDonald's also attracts children with the . . . food (especially hamburgers, cheeseburgers, and French fries) and the advertising. . . . *[C]hildren are more attracted to McDonald's because of the Happy Meal promotion . . ..*"[28]

59.     By advertising Happy Meals with toys as bait, McDonald's unfairly and deceptively markets directly to children. When McDonald's bombards children with advertisements or other marketing for Happy Meals with toys, many children will pester their parents repeatedly to take them to McDonald's, just so they can get the

---

[25]    Federal Trade Commission, *Marketing Food to Children and Adolescents* at ES-3 (2008), available at www.ftc.gov/os/2008/07P064504foodmktingreport.pdf. The 2006 data in this FTC report are the most recent available publicly.

[26]    *Ibid.*

[27]    Source: McDonald's Management News, published for McDonald's owners/operators and store management.

[28]    Source: McDonald's Fast Track Report [emphasis added].

CLASS ACTION COMPLAINT FOR VIOLATIONS OF
THE UNFAIR COMPETITION LAW, THE
CONSUMERS LEGAL REMEDIES ACT AND
DECLARATORY AND INJUNCTIVE RELIEF

12

1  current toy (usually a new one each week). Once there, the children are likely to receive

2  a meal that is too high in calories, saturated fat, added sugars, and sodium, and devoid

3  of whole grains. Developing a lifelong habit of eating unhealthy meals is likely to

4  promote obesity, high blood pressure, heart disease, diabetes, and other life-threatening

5  or debilitating diet-related diseases.[29] These consequences are all caused by kids being

6  baited by a cheap toy.

7      60.    Children in California spend as much time using screen media (television,

8  videos, video games, and computers) as they spend playing outside.[30] Children under

9  the age of six watch over an hour of television per day, and the amount of television

10  watched increases with age.[31] Annually, children in California view tens of thousands of

11  television commercials, with at least 30,000 commercials representing a common

12  ceiling.[32] Approximately half of the commercials during children's programming (as

13  classified by the Federal Communications Commissions) are for poor-nutrition food.[33]

14  Children in California, therefore, see approximately 15,000 television commercials for

15  poor-nutrition food each year. (Of course, they see a multitude of other food

16  advertisements on the Internet, in restaurant windows, and elsewhere).

17

18  _____

19  [29]    This complaint is limited to toys and other premiums sold with Happy Meals,
    although we note that items for which consumers pay extra, like the since-recalled

20  Shrek glasses, and the Mighty Meals aimed at older kids also contribute to the problem.

21  [30]    Kaiser Family Foundation, *Zero to Six: Electronic Media in the Lives of Infants,
    Toddlers and Preschoolers* (2003), available at

22  http://www.kff.org/entmedia/upload/Zero-to-Six-Electronic-Media-in-the-Lives-of-
    Infants-Toddlers-and-Preschoolers-PDF.pdf.

23  [31]    Kaiser Family Foundation, *Zero to Six: Electronic Media in the Lives of Infants,
    Toddlers, and Preschoolers,* (21003), available at

24  http://www.kff.org/entmedia/upload/Zero-to-Six-Electronic-Media-in-the-Lives-of-
25  Infants-Toddlers-and-Preschoolers-PDF.pdf.

26  [32]    Dale Kunkel & Jessica Castonguay, *Children and Advertising: Content,
    Comprehension, and Consequences,* in HANDBOOK OF CHILDREN AND THE MEDIA, 2ND ED. at

27  6 (Dorothy Singer and Jerome Singer eds., Thousand Oaks, CA: Sage) (forthcoming).

28  [33]    INSTITUTE OF MEDICINE, FOOD MARKETING TO CHILDREN: THREAT OR OPPORTUNITY?
    4-42 (National Academies Press 2006).

CLASS ACTION COMPLAINT FOR VIOLATIONS OF
THE UNFAIR COMPETITION LAW, THE
CONSUMERS LEGAL REMEDIES ACT AND
DECLARATORY AND INJUNCTIVE RELIEF

61.     Nearly all food advertisements viewed by children and adolescents are for products high in fat, sugar, or sodium,[34] and there is increasing evidence that the marketing of unhealthy food products is disproportionately targeted at ethnic minority children.[35]

62.     California children are deceived by marketing.

63.     Almost no child under the age of six understands marketing; they lack the cognitive maturity to perceive its persuasive intent. For example, children under the age of six believe television commercials are television programs. These effects persist, in somewhat diminished degree but still at a significant level, until the children are older than eight.

64.     Even the few children who may begin to understand persuasive intent of commercials are not fully able to understand that marketing by self-interested corporations influences their desires.

65.     "Comprehension of an advertiser's motives or intentions in conveying commercial messages poses a mental challenge that children below roughly 8 years of age are poorly equipped to handle. A younger child is more likely to focus on the product featured in an advertisement, as opposed to thinking about the company that produced it, or the abstract concept of their economic interests."[36]

66.     Thus, because these children do not understand marketing, they are inherently deceived by the marketing, just as adults are deceived by deliberately misleading marketing.

---

[34]    Children: 98%; adolescents: 89%.

[35]    Dale Kunkel & Jessica Castonguay, *Children and Advertising: Content, Comprehension, and Consequences*, in HANDBOOK OF CHILDREN AND THE MEDIA, 2ND ED. at 11-12 (Dorothy Singer and Jerome Singer eds., Thousand Oaks, CA: Sage) (forthcoming).

[36]    Dale Kunkel & Jessica Castonguay, *Children and Advertising: Content, Comprehension, and Consequences*, in HANDBOOK OF CHILDREN AND THE MEDIA, 2ND ED. at 22 (Dorothy Singer and Jerome Singer eds., Thousand Oaks, CA: Sage) (forthcoming).

CLASS ACTION COMPLAINT FOR VIOLATIONS OF
THE UNFAIR COMPETITION LAW, THE
CONSUMERS LEGAL REMEDIES ACT AND
DECLARATORY AND INJUNCTIVE RELIEF

1    67.    Marketing poor-nutrition Happy Meals to California children leads them

2  to prefer, purchase, and pester their parents to buy poor-nutrition Happy Meals.

3    68.    Children influence their families' expenditures each year.[37] Children as a

4  consumer group, including those eight and younger, spend approximately $200 billion

5  each year themselves.[38] One-third of what they spend is on food and beverages.[39]

6    69.    After being constantly bombarded with advertising for Happy Meals that

7  often feature toys, California children then bombard their parents with requests for the

8  toys and Happy Meals they have seen advertised. These requests sometimes lead

9  parents to purchase poor-nutrition Happy Meal items they would otherwise not buy.

10  Maya has requested Happy Meals from Parham because of McDonald's marketing

11  practices, and sometimes Parham, not wishing to cause family rancor, purchases such

12  meals.

13    70.    McDonald's is well aware of the impact of "pester power" on parents'

14  purchasing decisions and uses it to its advantage by advertising Happy Meals with

15  toys.

16    71.    For example, McDonald's founder Ray Kroc said that "if you had $1 to

17  spend on marketing, *spend it on kids, because they bring* mom and dad."[40]

18    72.    The toy has been the key to successful marketing to children of Happy

19  Meals. Joe Johnston, who was on the advertising-agency team in the early 1970s that

20  invented McDonald's Fun Meal, which later became the Happy Meal once a toy was

21

22

23  [37]    INSTITUTE OF MEDICINE, FOOD MARKETING TO CHILDREN: THREAT OR OPPORTUNITY?
24  1-4 (National Academies Press 2006).

25  [38]    INSTITUTE OF MEDICINE, FOOD MARKETING TO CHILDREN: THREAT OR OPPORTUNITY?
    1-4 (National Academies Press 2006).

26  [39]    J.U. McNeal *Tapping the Three Kids' Markets, AMERICAN DEMOGRAPHICS* (April
    1998), at 36, accessed on LexisNexis, February 9, 2006.

27  [40]    Roy T. Bergold, Jr., "Is Obesity Really Our Fault?" QSR Magazine (June 2010),
28  accessible at www.qsrmagazine.com/articles/columnists/roy_bergold/0610/obesity-
    1.phtml. Mr. Bergold was McDonald's advertising head for 29 years.

CLASS ACTION COMPLAINT FOR VIOLATIONS OF
THE UNFAIR COMPETITION LAW, THE
CONSUMERS LEGAL REMEDIES ACT AND
DECLARATORY AND INJUNCTIVE RELIEF

1    added, acknowledged that "Yes, even then, we knew that *we needed a toy to make it*
2    *work*".

3           73.    A consultant for McDonald's brags, "McDonald's knows that by targeting
4    families, it hits one of the most attractive, loyal consumer groups available. It gets into
5    *the parents' wallets via the kids' minds*". Given the strength of this strategy, it's no
6    wonder that McDonald's has become what it is.[41]

7           74.    McDonald's has a long history of targeting children and families.
8    McDonald's Founder Kroc boasted, "we used to spot good locations for McDonald's
9    stores by flying over a community and looking for schools and church steeples."[42]

10          75.    The deceptive nature of McDonald's Happy Meals marketing is not
11   debatable. Even industry insiders recognize it.

12          76.    The long-time head of McDonald's advertising recently commented that
13   "Research says that *seven-year-olds and younger accept what we say in advertising as*
14   *the truth*. Heck, three-year-olds can identify brands using just their corporate logos.
15   According to a survey commissioned by the Center for a New American Dream back in
16   2002, the average kid asks his parent for something nine times before the parent gives
17   in....*What's a mother to do under this assault?*"[43]

18          77.    "In an ideal world, perhaps parents would ignore all of children's
19   requests for lavish toys and unhealthy snack foods, but, in fact, research is clear that
20   parents have a high rate of yielding to children's purchase-influence requests.
21   Moreover, most children begin to receive their own spending money as young as eight

---

[41]    Martin Lindstrom, "Branding: Its [*sic*] All About Focus," available at
www.martinlindstrom.com/index.php/cmsid__list_articles/__1159. Mr. Lindstrom
advises McDonald's on all aspects of brand building including sensory branding,
neuromarketing and optimization.
http://www.martinlindstrom.com/index.php/cmsid__consulting.

[42]    Kroc, Ray, *Grinding It Out: The Making of McDonald's*, p.176 (Contemporary
Books, Inc. 1976).

[43]    Roy T. Bergold, Jr., *supra*.

CLASS ACTION COMPLAINT FOR VIOLATIONS OF
THE UNFAIR COMPETITION LAW, THE
CONSUMERS LEGAL REMEDIES ACT AND
DECLARATORY AND INJUNCTIVE RELIEF

1   years of age, and one of the earliest products they are allowed to buy without explicit

2   parental consent is snack foods."[44]

3        78.     After the Center for Science in the Public Interest (CSPI), lead counsel in

4   this action, sent notice of intent to sue to McDonald's (in an unsuccessful effort to

5   resolve this problem without litigation), a marketing-industry insider noted that "CSPI

6   claims McD's violates several state consumer laws because advertising to kids is

7   'inherently deceptive, because young kids are not developmentally advanced enough to

8   understand the persuasive intent of marketing.' *This, as a fact, is true.*"[45]

9        79.     Parents in California have almost no ability or opportunity to control

10   where and how their children view marketing. Marketing aimed at California children

11   is everywhere: on television, in magazines, on Web sites, on billboards, on school buses,

12   in restaurants, and in school cafeterias and on school vending machines.

13        80.     On information and belief, McDonald's is aware of the inability of

14   California children to understand the persuasive intent of marketing and its impact on

15   their decision-making. Yet, in California, McDonald's knowingly takes advantage of the

16   cognitive immaturity of children and advertises poor-nutrition Happy Meals to them,

17   often advertising "free" toys to make its marketing efforts particularly persuasive.

---

[44]    Dale Kunkel & Jessica Castonguay, *Children and Advertising: Content, Comprehension, and Consequences*, in HANDBOOK OF CHILDREN AND THE MEDIA, 2ND ED. at 33 (Dorothy Singer and Jerome Singer eds., Thousand Oaks, CA: Sage) (forthcoming).

[45]    Jim Edwards, "How McDonald's Happy Meal Will Survive This Perfect Storm of Child Abuse Accusations and Litigation." CBS Interactive (July 8, 2010), available at http://www.bnet.com/blog/advertising-business/how-mcdonald-8217s-happy-meal-will-survive-this-perfect-storm-of-child-abuse-accusations-and-litigaton/5156 [emphasis added]. Mr. Edwards is former managing editor of *Adweek* and has covered drug marketing at *Brandweek*.

CLASS ACTION COMPLAINT FOR VIOLATIONS OF
THE UNFAIR COMPETITION LAW, THE
CONSUMERS LEGAL REMEDIES ACT AND
DECLARATORY AND INJUNCTIVE RELIEF

17

**IV.    McDonald's Advertising Directly, Proximately, and Cognizably Harms California Children and Their Parents**

81.    California parents' lack of control over the marketing of Happy Meals to their children strains their ability to raise healthy children and to instill healthy eating habits in them.[46]

82.    McDonald's deceptively markets Happy Meals to Maya and members of the Children Class, continuing its decades-old practice of advertising Happy Meals with toys to market directly to children in order to bypass the parents and increase sales.

83.    After years of criticism of its marketing practices, McDonald's pledged to the Better Business Bureau that it would advertise only Happy Meals that meet McDonald's own nutrition standards for children (although those standards are weaker than appropriate). However, that pledge fails to address McDonald's insidious use of toys in advertising its products to children. Regardless of the Happy Meal combinations shown in advertising, almost all Happy Meal combinations are nutritionally inappropriate for very young children. Moreover, the default[47] choice for the side dish tends to be the nutritionally poor French fries, not the less-harmful (but still not healthy) Apple Dippers with sugary Caramel Dipping Sauce.[48]

84.    A reasonable lunch for a young child should contain no more than 430 calories (one-third of the 1,300 calories that is recommended daily intake for sedentary children 4 to 8 years old)

---

[46]    JULIET B. SCHOR, BORN TO BUY 130-32, 160-65 (Scribner 2004).

[47]    A "default" item is one that the McDonald's employee includes in a Happy Meal without asking.

[48]    Apple Dippers consist of apple slices and a sugary caramel dipping sauce, effectively the kind of caramel apple one might buy a carnival.

CLASS ACTION COMPLAINT FOR VIOLATIONS OF
THE UNFAIR COMPETITION LAW, THE
CONSUMERS LEGAL REMEDIES ACT AND
DECLARATORY AND INJUNCTIVE RELIEF

18

85.     The pre-suit notice delivered to McDonald's on June 22, 2010, described the problems set out in detail herein, describing the number of unhealthy meals thus:

> McDonald's Web site lists 24 Happy Meal combinations. Considering that a reasonable lunch for a young child would contain no more than 430 calories (one third of the 1,300 calories that is the recommended daily intake for children 4 to 8 years old), not a single Happy Meal meets that target. The average of all 24 meals is 26 percent higher in calories than a reasonable lunch. In fact, one meal (cheeseburger, French fries, and chocolate milk) hits 700 calories — a whopping 63 percent higher (and more than half the calories for the entire day).

86.     The source for these numbers was McDonald's own published Happy Meals nutrition information available on its website, and dated June 2, 2010.

87.     Three days after it received the pre-suit notice, McDonald's altered this data, reducing the amount of calories and sugar.[49]

88.     After McDonald's altered its own data, three of the 24 meals suddenly met the calorie target described in the pre-suit notice.

89.     Plaintiff has no idea why McDonald's would suddenly alter its own data in a manner that made these three meals appear healthier (but still not healthy — all 24 meals exceed 400 mg of sodium, one-third of the 1,200-milligram recommendation for sodium for children).

90.     In a CSPI study of 44 McDonald's outlets, the default Happy Meal almost always included French fries. In response to a request for a hamburger Happy meal, the McDonald's employee, without asking customers which side dish they wanted,

---

[49]     Nutrition.mcdonalds.com/nutrionexchange/Happy_Meals_Nutrition_List.pdf (last accessed December 14, 2010).

CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE UNFAIR COMPETITION LAW, THE CONSUMERS LEGAL REMEDIES ACT AND DECLARATORY AND INJUNCTIVE RELIEF

19

provided fries 93 percent of the time.[50] (Beverage choices were usually offered, but a soft drink was the first option offered 78 percent of the time.)

91.    Thus, McDonald's claims it is serving up healthier options, but in fact it is not, for several reasons:

- The best-possible combination is still fried chicken and a caramel apple.[51]

- Although McDonald's briefly depicts the best-possible combinations in its advertising, those depictions are fleeting. It engages in bait-and-switch 93% of the time, substituting the far-more-unhealthy French fries for Apple Dippers. Indeed, many of McDonald's commercials aimed at very young children are intended to spur visits to McDonald's stores rather than to promote a particular food item…but, of course, the toys are heavily featured.

- On information and belief, the cost of McDonald's to produce an order of French fries is significantly less than the cost to produce the apples and dipping sauce for the Apple Dippers. Thus, McDonald's Bait-and-switch practice is likely based largely on financial motives.

92.    McDonald's duplicitous approach to marketing directed to children can be seen in a recent press release that boasts that the Company's Shrek-based promotion will "encourage kids to 'Shrek Out' their Happy Meals around the world with menu

---

[50]    Twenty-seven health and nutrition professionals visited 44 restaurants in 14 states. They purchased 41 Happy Meals inside of restaurants and 34through drive-throughs, for a total of 75 assessments.

[51]    This meal consists of four fried Chicken McNuggets and less than half of one small apple accompanied by caramel sauce, with less calories, saturated fat, and sodium than the other choices.

options like fruits, vegetables, low-fat dairy and fruit juices."[52] In reality, though, the whole point of the Shrek promotion is to get kids into McDonald's where they most likely will end up being served unhealthy default options and eating unhealthy meals.

93.     Consider the Happy Meal composed of a cheeseburger, French fries, and chocolate milk. That meal has 700 calories (more than half a day's worth for sedentary young children), 9 grams of saturated fat (more than half the 14 gram recommended limit), 1,080 milligrams of sodium (more than three-fourths of the 1,200 milligram limit), and about twice the 16-gram recommended daily limit for added sugars. Furthermore, the bun is made with white flour, not the whole-wheat flour that is recommended for at least half a consumer's grain intake.

94.     Maya, age six, continually clamors to be taken to McDonald's "for the toys."

95.     Maya and other members of the Children Class have been deceived by McDonald's marketing practices.

96.     Maya does not understand that McDonald's marketing efforts are intended to make her want to eat Happy Meals. Maya interprets this marketing as good advice for proper eating.

97.     Often, Maya wants Happy Meals because toys based on trusted characters from television and movies (such as Shrek) endorse the Happy Meals in McDonald's advertising.

---

[52]     www.aboutmcdonalds.com/mcd/media_center/recent_news/corporate/
Press_Release_McDonalds_Launches_Shrek_Themed_Happy_Meal_to_Motivate_Kids_
to_Eat_More_Fruits_Vegetables_and_Dairy.html

**CLASS ACTION COMPLAINT FOR VIOLATIONS OF
THE UNFAIR COMPETITION LAW, THE
CONSUMERS LEGAL REMEDIES ACT AND
DECLARATORY AND INJUNCTIVE RELIEF**

98. A few of the many toys that have induced Maya to clamor for Happy Meals and to pester Parham to purchase Happy Meals for the sake of obtaining a toy are:

- I-Carly lip gloss and note pad
- Barbie lip gloss and small comb
- Shrek movie character figures
- Strawberry Shortcake mini-dolls with paper and mini-stamps
- "American Idol" toy

99. McDonald's marketing practices are unfair and deceptive to Maya and other members of the Children Class.

100. McDonald's has unfairly influenced Maya. Its Happy Meals advertising aimed at Maya has influenced her to desire and to eat the poor-nutrition Happy Meals, thereby harming Maya's health without her knowledge or comprehension.

101. When given the choice, Maya wants to eat Happy Meals instead of fruits, vegetables, and whole grains because McDonald's has convinced her that she needs to get the toy.

102. McDonald's marketing practices are unfair to Parham and members of the Parents Class.

103. One instance that is particularly frustrating to Parham, because it is outside of her control, is that Maya's friends are McDonald's viral marketers.

104. Maya learns of Happy Meal toys from other children in her playgroup, despite Parham's efforts to restrict Maya's exposure to McDonald's advertising and access to Happy Meal toys. This is McDonald's advertising directive – to subvert parental authority and mobilize pester power in order to sell unhealthful meals to kids using the lure of a toy.

CLASS ACTION COMPLAINT FOR VIOLATIONS OF
THE UNFAIR COMPETITION LAW, THE
CONSUMERS LEGAL REMEDIES ACT AND
DECLARATORY AND INJUNCTIVE RELIEF

22

105.   McDonald's has unfairly interfered with Parham's relationship with
Maya.

106.   Because of McDonald's marketing, Maya has frequently pestered Parham
into purchasing Happy Meals, thereby spending money on a product she would not
have otherwise purchased.

107.   Although Parham frequently denies Maya's repeated requests for Happy
Meals, these denials have angered and disappointed Maya, thus causing needless and
unwarranted dissension in their parent-child relationship.

108.   Maya's exposure to Happy Meal marketing has undermined Parham's
parental authority, because the advertisements result in Maya's desire for poor-
nutrition Happy Meals, and inability to understand why Parham will not generally buy
them for her.

### CLASS ACTION ALLEGATIONS

109.   Maya brings this action on behalf of herself and on behalf of a class of all
California children under the age of eight who have seen marketing for Happy Meals
during the "Class Period" ("Children Class").

110.   Parham brings this action on behalf of herself and on behalf of all
California residents who are parents of members of the Children Class and purchased
Happy Meals during the Class Period ("Parents Class").

111.   Specifically excluded from both the Children Class and Parents Class are
any entity in which McDonald's has a controlling interest, and the officers, directors,
employees, affiliates, subsidiaries, legal representatives, heirs, successors and their
assigns of any entity, together with any immediate family member of any officer,
director or employee of said companies. Also excluded from the class is any judge or

CLASS ACTION COMPLAINT FOR VIOLATIONS OF
THE UNFAIR COMPETITION LAW, THE
CONSUMERS LEGAL REMEDIES ACT AND
DECLARATORY AND INJUNCTIVE RELIEF

judicial officer presiding over this action and members of their families within the third degree of relationship.

112.    Each class consists of at least 100,000 members. Thus, each class is too numerous to make it practicable to join all members as plaintiffs.

113.    For each class, there are questions of law and fact that predominate over any questions affecting only individual class members. These issues include:

a.    Whether McDonald's has engaged in unfair practices;

b.    Whether McDonald's has engaged in deceptive practices;

c.    The extent to which members of the Parents Class have been injured as a result of these practices;

d.    The extent to which members of the Children Class have suffered injury as a result of these practices;

e.    Whether these practices render McDonald's in violation of California's Unfair Competition Law, California Business and Professions Code § 17200 and § 17500 *et seq.*; and California's CLRA § 1750 *et seq.*

114.    Maya's claims are typical of claims of the Children Class she seeks to represent.

115.    Parham's claims are typical of the claims of the Parents Class she seeks to represent.

116.    Maya and Parham will fairly and adequately protect the interest of their respective classes. They intend to prosecute these claims vigorously and seek to obtain relief that would benefit the entirety of each class. They have no conflicts with their respective classes.

117.    Counsel for Maya and Parham are qualified to litigate the claims of each class.

CLASS ACTION COMPLAINT FOR VIOLATIONS OF
THE UNFAIR COMPETITION LAW, THE
CONSUMERS LEGAL REMEDIES ACT AND
DECLARATORY AND INJUNCTIVE RELIEF

118.     Common issues of law and fact predominate over issues affecting only individuals.

119.     A class action is superior to other available methods to resolve the controversies arising from McDonald's practices. Many of the members of each class (especially the children) are likely unaware of their legal rights. In the absence of class actions, many members of each class would not have their claims redressed.

### CLAIMS FOR RELIEF

### COUNT I

### ENGAGING IN DECEPTIVE MARKETING AND BUSINESS PRACTICES

**(Maya individually and as class representative)**

120.     It is unlawful to engage in deceptive acts or practices while engaged in any trade or commerce in California. California Business and Professions Code § 17200 *et seq.*

121.     McDonald's violates the California Unfair Competition Law each time it markets Happy Meals to California children.

### COUNT II

### ENGAGING IN UNFAIR MARKETING AND BUSINESS PRACTICES

**(Maya and Parham individually and as class representatives)**

122.     It is unlawful to engage in unfair acts or practices while engaged in any trade or commerce in California. California Business and Professions Code § 17200 *et seq.*

123.     McDonald's violates the California Unfair Competition Law each time it markets Happy Meals to California children.

CLASS ACTION COMPLAINT FOR VIOLATIONS OF
THE UNFAIR COMPETITION LAW, THE
CONSUMERS LEGAL REMEDIES ACT AND
DECLARATORY AND INJUNCTIVE RELIEF

# COUNT III

## ENGAGING IN UNFAIR METHODS OF COMPETITION AND UNFAIR OR DECEPTIVE ACTS OR PRACTICES

### (Maya and Parham individually and as class representatives)

124. "Unfair methods of competition and unfair or deceptive acts or practices undertaken by any person in a transaction intended to result or which results in the sale or lease of goods or services to any consumer are unlawful." Consumer Legal Remedies Act California Civil Code § 1750, *et seq.* ("CLRA").

125. The Happy Meals at issue are "goods" as defined by CLRA § 1761(a).

126. Defendants are "persons" as defined by CLRA § 1761(c).

127. Plaintiffs and the Putative Class members are "consumers" as defined by CLRA § 1761(d).

128. The purchase of Happy Meals by the Plaintiffs and Putative Class members are "transactions" as defined by CLRA § 1761(e).

129. McDonald's advertising and selling Happy Meals with toys to very young children is prohibited pursuant to the CLRA because it is inherently deceptive and was "undertaken by any person in a transaction intended to result or which results in the sale or lease of goods or services to any consumer."

130. McDonald's violates the CLRA by knowingly and intentionally advertising Happy Meals with toys to very young children.

131. This unfair and deceptive practice violates CLRA § 1770(a)(5), which prohibits "Representing that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities which they do not have . . ."

CLASS ACTION COMPLAINT FOR VIOLATIONS OF
THE UNFAIR COMPETITION LAW, THE
CONSUMERS LEGAL REMEDIES ACT AND
DECLARATORY AND INJUNCTIVE RELIEF

26

132. This unfair and deceptive practice is also a violation of CLRA § 1770(a)(7) which prohibits "Representing that goods or services are of a particular standard, quality, or grade, or that goods are of a particular style or model, if they are of another."

133. McDonald's unfair and deceptive acts and practices have violated, and continue to violate the CLRA, because they extend to transactions that are intended to result, or have resulted, in the sale or lease of goods or services to consumers, including the Plaintiffs and the Putative Class members.

134. As a direct and proximate result of McDonald's unfair and deceptive acts and practices, the Plaintiffs and the Putative Class members have suffered damage in that they purchased deceptively advertised and unhealthy Happy Meals.

135. Plaintiffs would not have bought Happy Meals but for McDonald's deceptive marketing to very young children with a toy.

## COUNT IV

### ENGAGING IN UNLAWFUL METHODS OF COMPETITION AND UNFAIR OR DECEPTIVE ACTS OR PRACTICES

### (Maya and Parham individually and as class representatives)

136. McDonald's acts and practices constitute unlawful business acts and practices.

137. McDonald's marketing with toys and other inducements is inherently deceptive to very young children.

138. McDonald's business practices alleged above are unlawful under the CLRA, which forbids deceptive advertising, among other things. By violating the CLRA, McDonald's has committed unlawful acts and have violated California Business and Professions Code § 17200 *et seq.*

CLASS ACTION COMPLAINT FOR VIOLATIONS OF
THE UNFAIR COMPETITION LAW, THE
CONSUMERS LEGAL REMEDIES ACT AND
DECLARATORY AND INJUNCTIVE RELIEF

27

**RELIEF REQUESTED**

Plaintiffs, individually and on behalf of all others similarly situated, respectfully request that the Court:

1. Certify the claims to be asserted as a class action.

2. Declare that McDonald's advertising acts and practices violate the California Unfair Competition Law and the California Consumer Legal Remedies Act.

3. Enjoin McDonald's from continuing to advertise Happy Meals to California children featuring toys.

4. Award costs and attorney's fees, in an amount to be determined at trial.

5. Order McDonald's to pay reasonable costs, attorneys' fees, and expert fees.

6. Grant all other relief that the Court deems just and proper.

**JURY REQUEST**

PLAINTIFFS REQUEST A TRIAL BY JURY AS TO ALL ISSUES SO TRIABLE.

Dated December 15, 2010

Baker Law, P.C.
2229 1st Avenue North
Birmingham, AL 35203
G. Richard Baker, Esquire

Center for Science in the
Public Interest
5646 Milton Street, Suite
211
Dallas, TX 75206
Stephen Gardner, Esquire
Seema Rattan, Esquire

CLASS ACTION COMPLAINT FOR VIOLATIONS OF
THE UNFAIR COMPETITION LAW, THE
CONSUMERS LEGAL REMEDIES ACT AND
DECLARATORY AND INJUNCTIVE RELIEF



**SUPERIOR COURT OF CALIFORNIA**

**COUNTY OF SAN FRANCISCO**

# Document Scanning Lead Sheet

Jan-05-2011 2:56 pm

Case Number: CGC-10-506178

Filing Date: Jan-05-2011 2:55

Juke Box: 001    Image: 03081814

COMPLAINT

IET PARHAM, ON BEHALF OF HERSELF AND THOSE et al VS. MCDONALD'S CORPORA

001C03081814

**Instructions:**
Please place this sheet on top of the document to be scanned.

1  George Richard Baker, Esquire (SBN 224003)
   Baker Law, P.C.
2  2229 1st Avenue North
   Birmingham, AL 35203
3  205.241.9608 (telephone)
   205.449.0050 (facsimile)
4
   Stephen Gardner, Esquire (*pro hac vice* to be sought)
5  Seema Rattan, Esquire (*pro hac vice* to be sought)
   Center for Science in the Public Interest
6  5646 Milton Street, Suite 211
   Dallas, TX 75206
7  214.827.2774 (telephone)
   214.827.2787 (facsimile)
8
   *Attorneys for Plaintiff*
9

**F I L E D**
Superior Court of California
County of San Francisco

JAN 0 5 2011

CLERK OF THE COURT
BY: _Lenolyn Darustin_
Deputy Clerk

10            SUPERIOR COURT OF THE STATE OF CALIFORNIA

11                IN AND FOR SAN FRANCISCO COUNTY

12  MONET PARHAM, on behalf of herself      CASE NO.: CGC-10-506178
    and those similarly situated,
13                                          **AMENDED CLASS ACTION**
                                            **COMPLAINT FOR VIOLATIONS OF**
14          Plaintiff,                      **THE UNFAIR COMPETITION LAW,**
                                            **THE CONSUMERS LEGAL REMEDIES**
15      vs.                                 **ACT AND DECLARATORY AND**
                                            **INJUNCTIVE RELIEF**
16  McDONALD'S CORPORATION and
    McDONALD'S USA, LLC,
17
            Defendants.                     Plaintiff Requests Jury Trial on all Issues
18                                          Triable by a Jury

19                                          **BY FAX**
20
21                       **INTRODUCTION**

22      1.      Plaintiff, by and through undersigned counsel, bring this class action on

23  her own behalf and on behalf of the class comprised of all other individuals similarly

24  situated within the State of California, pursuant to California's Unfair Competition

25  Law, Business and Professions Code §§ 17200 *et seq.* ("UCL"), and California's False

26  Advertising Law, Business and Professions Code § 17500, *et seq.* ("FAL"), and The

27  Consumers Legal Remedies Act Civil Code § 1750, *et seq.* ("CLRA") against

28  McDonald's. Plaintiff asserts that Defendants engage in the unfair, unlawful, deceptive

1   and fraudulent practice of promoting and advertising McDonald's Happy Meal

2   products to very young California children, using the inducement of various toys.

3       2.    McDonald's exploits very young California children and harms their

4   health by advertising unhealthy Happy Meals with toys directly to them. Children eight

5   years old and younger do not have the cognitive skills and the developmental maturity

6   to understand the persuasive intent of marketing and advertising.

7       3.    Thus, McDonald's advertising featuring toys to bait children violates

8   California law because it is inherently deceptive and unfair.

9       4.    McDonald's advertising is also unfair to its competitors, who do not

10  choose to attract very young children with the lure of a toy.

11      5.    According to the Institute of Medicine, "Before a certain age, children lack

12  the defenses, or skills, to discriminate commercial from noncommercial content, or to

13  attribute persuasive intent to advertising. Children generally develop these skills at

14  about age 8 years, but children as old as 11 may not activate their defenses unless

15  explicitly cued to do so."[1]

16      6.    The United States Supreme Court noted this year that children "have lack

17  of maturity and an underdeveloped sense of responsibility; they are *more vulnerable or*

18  *susceptible to negative influences and outside pressures,* including peer pressure; and

19  their characters are not as well formed."[2]

20      7.    Federal law has a long history of recognizing that advertising that is not

21  understood to be advertising is misleading to consumers, and intervening to prevent

22

23

24

25  [1]    INSTITUTE OF MEDICINE, FOOD, MARKETING TO CHILDREN: THREAT OR

26  OPPORTUNITY? ES-4 (National Academics Press 2006).

    [2]    *Graham v. Florida*, 130 S.Ct. 2011, 2026-2027 (2010) (emphasis added; internal

27  quotations and citations omitted). The Court was speaking of teenagers, but the

28  comments apply with even more force to younger children.

AMENDED CLASS ACTION COMPLAINT
CASE No. CGC-10-506178

2

deception.[3] "These laws all stem from the principle that the public is entitled to know when and by whom it is being persuaded."[4]

8.      Children under the age of eight do not understand advertising; they lack the ability to perceive its persuasive intent. When exposed to advertising, children under eight lack the skills to know when and by whom they are being persuaded.

9.      Children nonetheless influence the purchasing decisions of their parents. McDonald's exploits that influence, by bombarding children with advertisements for Happy Meals with toys, knowing that it will result in kids nagging parents to purchase nutritionally poor Happy Meals for their children.

10.     Internal McDonald's documents prove its intent to subvert parental authority. One internal document says that "[r]esearch shows when families with kids visit McDonald's, the kids alone decide on McDonald's in 53% of the cases ...[o]n all, they [children] influence 95% of family visits to McDonald's."[5] McDonald's thus affirmatively and knowingly targets the most vulnerable class of consumers, very young children, in order to insidiously and deceptively access parents' wallets.

11.     The Federal Trade Commission reported to the President that "[m]arketing directly to children essentially is an end-run" around the parents' role, and should be stopped.[6]

---

[3]      *See* e.g. 47 U.S.C. § 317.

[4]      Richard Kielbowicz and Linda Lawson, *Unmasking Hidden Commercials in Broadcasting: Origins of the Sponsorship Identification Regulations*, 1927-1963, 56 Federal Communications Law Journal 327, 330 (2004).

[5]      Source: *McDonald's OPNAD Newsletter*, a "publication for McDonald's owner/operators.

[6]      Federal Trade Commission, "Marketing Violent Entertainment to Children: A Review of Self-Regulation and Industry Practices in the Motion Picture, Music Recording & Electronic Game Industries" at 54 (2000). Although this comment was in the context of a different form of different form of harmful marketing practices, the finding applies equally here. The report is available at www.ftc.gov/reports/violence/vioreport.pdf.

12.    The White House Task Force on Childhood Obesity has stated that restaurants "have an important role to play in creating a food marketing environment that supports, rather than undermines, the efforts of parents and other caregivers to encourage healthy eating among children and prevent obesity."[7]

13.    Experts, including the American Psychological Association, agree with the FTC's and the White House Task Force's position.

14.    By advertising that Happy Meals include toys, McDonald's has helped create, and continues to exacerbate, a super-sized health crisis in California. Increasing numbers of children are making poor nutritional choices, developing unhealthy eating habits that will follow them into adulthood, and becoming obese.

15.    Most Happy Meals are too high in calories, saturated fat, and sodium to be healthful for very young children. Most Happy Meals lack healthful servings of fruits and vegetables and have little dietary fiber and whole grains. According to the Institute of Medicine, "Diets that are high in calories and other constituents such as saturated fats and low in certain nutrients are putting our children and youth at risk for diseases later in life, such as heart disease, stroke, circulatory problems, some cancers, diabetes, and osteoporosis."[8]

16.    Advertising poor-nutrition Happy Meals with toys to children is a contributing factor in this crisis.

17.    These marketing practices are unfair to parents as well as their children because they interfere with the parents' ability to instill good eating habits in their children and because they cause conflict between parents and their children.

---

[7]    White House Task Force on Childhood Obesity (2010). "Solving the problem of childhood obesity within a generation." Available at www.letsmove.gov/tfco_fullreport_may2010.pdf.

[8]    INSTITUTE OF MEDICINE, FOOD MARKETING TO CHILDREN: THREAT OR OPPORTUNITY? E-1 (National Academies Press 2006).

18.     McDonald's is engaged in a highly sophisticated scheme to use the bait of toys to exploit children's developmental immaturity and subvert parental authority. That scheme is designed to sell and get children to eat nutritionally unbalanced Happy Meals, which in turn promote obesity and other diet-related diseases.

19.     Just this month, two prestigious publications, The New York Times and Psychology Today, criticized McDonald's practice of including toys in nutritionally poor meals in order to sell their product.[9]

20.     McDonald's advertising of Happy Meals with toys is deceptive and unfair to children, unfair to parents, and in violation of California law. For these reasons, Plaintiff seeks the relief set forth herein.

## JURISDICTION AND VENUE

21.     This Court has jurisdiction over Plaintiff's claims.

22.     The claims made by the Plaintiff on behalf of herself and other members of the Class she purports to represent are brought pursuant to the UCL, the FAL and the CLRA for injunctive relief but not for restitution, penalties, or damages. Thus, the value of the claims to Plaintiff and to the class, and thus the amount in controversy, is far below $75,000. No matter how evaluated, the amount in controversy falls far short of $5,000,000.00. Accordingly, Plaintiff could not elect to bring this case in federal court because there is an insufficient amount in controversy to evoke federal jurisdiction.

23.     The jurisdiction and venue of this action in the Superior Court in and for the County of San Francisco is based upon California Code of Civil Procedure § 410.10.

24.     Venue is appropriate in the County of San Francisco pursuant to California Code of Civil Procedure § 395. Venue in this Court is proper in that

---

[9]     See Editorial, *Not So Happy Meals*, N.Y. Times, December 20, 2010, § A at 28. Available at http://www.nytimes.com/2010/12/20/opinion/20mon4.html *and The End of the Happy Meal?* Available at http://www.psychologytoday.com/blog/its-not-just-baby-fat/201012/the-end-the-happy-meal.

1   McDonald's transacted business in California and the conduct complained of occurred
2   in California.

3       25.     Plaintiff files her affidavit showing these facts concurrently with the
4   Complaint as required by CC § 1780(d).

5                           **CONDITIONS PRECEDENT**

6       26.     All conditions precedent have been performed or have occurred.

7                                   **PARTIES**

8       27.     Monet Parham ("Parham") is a parent residing in Sacramento, California,
9
    with children ages two and six. Parham brings this action on her own behalf.
10
        28.     Plaintiff has standing to bring this case on her own behalf because she has
11
12  lost money or property because of Defendants' activities, and therefore has suffered an
    "injury in fact." Plaintiff is also a "consumer" and "real party in interest" as defined by
13
    the CLRA.
14
        29.     Defendants McDonald's Corporation and McDonald's USA, LLC
15
16  (collectively "McDonald's"), incorporated in Delaware and Illinois, respectively, own
    and operate the largest and most successful fast food chain in history.
17
                                     **FACTS**
18
19  I.   **Definitions**

20      30.     The term "advertising" includes all forms of marketing in all forms of
21  media and venues, including without limitation: print advertisements, television and
22  radio commercials, product labels, magazines, use of licensed characters, use of
23  celebrities, viral marketing, web sites, signage at restaurants, toys, advergaming,
24  sponsorships, school-based marketing (such as book covers and sponsored educational
25  material), and kids clubs.

26      31.     "Class Period" is the period from December 15, 2006 for Counts I and III;
27  December 15, 2007 for Count II and to the date of class certification, or as otherwise
28  determined by the Court.

                                    AMENDED CLASS ACTION COMPLAINT
                                    CASE No. CGC-10-506178

                                        6

32.    "Happy Meals" are the meals that McDonald's produces for, and markets directly to, very young children and that are accompanied by a free toy.

33.    Unless otherwise stated, all references to "children" in this complaint means California-resident children eight years or younger.

## II.    Background: A Children's Health Crisis of Epidemic Proportions

34.    Increasing numbers of children in California are unhealthy. Many children are becoming overweight or obese and are suffering from diet-related health problems, like diabetes.[10] High-sodium diets boost blood pressure, even in very young children, and saturated fat and cholesterol start clogging arteries in children and youths.

35.    Diet-related health problems persist into adulthood. The eating habits and attitudes about nutrition that children adopt often extend into adulthood.[11]

36.    Currently, 73% of adults are overweight, obese, or extremely obese.[12] A growing number of children are overweight, obese, or suffer from diet-related health problems, which is an indication that the number of adults with these problems will likely grow. This will further burden California's health-care system, which is already overwhelmed.[13]

37.    In California, an increased number of children have poor diets, due in significant part to poor-nutrition foods such as Happy Meals. Happy Meals and other poor-nutrition foods often replace healthier foods and beverages in children's diets and accustom children to seeking and eating poor-nutrition foods even outside the fast-

[10]    INSTITUTE OF MEDICINE, FOOD MARKETING TO CHILDREN: THREAT OR OPPORTUNITY? 2-4 (National Academies Press 2006).

[11]    INSTITUTE OF MEDICINE, FOOD MARKETING TO CHILDREN: THREAT OR OPPORTUNITY? E-1 (National Academies Press 2006).

[12]    Results from the 2005-2006 National Health and Nutrition Examination Survey (NHANES) available at www.cdc.gov/nchs/data/hestat/overweight/overweight_adult.htm.

[13]    INSTITUTE OF MEDICINE, FOOD MARKETING TO CHILDREN: THREAT OR OPPORTUNITY? 5-28 (National Academies Press 2006).

AMENDED CLASS ACTION COMPLAINT
CASE No. CGC-10-506178

7

1   food-restaurant venue. For example, only 2% of children eat a healthy diet consistent

2   with the main dietary recommendations of the U.S. Department of Agriculture.[14] Only

3   6% of children meet the USDA recommended limit of saturated fat intake; only 30% of

4   children consume the USDA-recommended number of servings of milk each day; and

5   only 15% eat the daily recommendation of fruit.[15]

6       38.     The great majority of Happy Meals sold in California harm children's

7   diets, and do not provide the nutrients required for healthy growth and development.

8   Consumption of poor-nutrition food such as the contents of Happy Meals contributes to

9   the development of obesity, high blood pressure, diabetes, and obesity-related illnesses

10   in children. Even if children consume healthy foods at other times, consumption of

11   Happy Meals is harmful.

**III.   Advertising Happy Meals with Toys to Children is Unfair & Deceptive**

**A.     Targeting Children**

14      39.     McDonald's practice of marketing poor-nutrition Happy Meals to children

15   in California is pervasive, with over 1300 McDonald's restaurants in California alone.

16      40.     McDonald's markets poor-nutrition Happy Meals to California children

17   through television advertisements, store signage, billboards, Web sites, branded

18   merchandise, product packaging, magazines, and in schools and other venues.

19      41.     Companies — with McDonald's leading the pack — employ a myriad of

20   methods to determine what children prefer, how to make children like their products,

21   and how to formulate their products, so they appeal almost irresistibly to children.

22   These methods include: conducting consumer studies, observing children playing and

---

[14]     K. Munoz, S. Krebs-Smith, R. Ballard-Barbash and L. Cleveland, *Food Intakes of U.S. Children and Adolescents Compared with Recommendations*, 100 PEDIATRICS 323 (1997).

[15]     U.S. Department of Agriculture, Office of Analysis, Nutrition and Evaluation. CHANGES IN CHILDREN'S DIETS: 1989-1991 to 1994-1996 (USDA 2001).

1  using various products in their homes and schools, and using children as informants on

2  what other children like and do not like.[16]

3      42.      "Total U.S. expenditures on marketing to children are estimated at $15-17

4  billion. It is hard to imagine (and certainly difficult to estimate) the total economic

5  stakes involved for businesses that depend upon child purchases and child influence on

6  parental spending."[17]

7      43.      After studying the effect of marketing on children, the American

8  Psychological Association (APA) released a report on the issue. That report found,

9  "Because young children lack the cognitive skills and abilities of older children and

10  adults, they do not comprehend commercial messages in the same way as do more

11  mature audiences, and, hence, are uniquely susceptible to advertising influence. A

12  substantial body of research evidence documents age-related differences in how

13  children understand and are affected by television advertising. This evidence has

14  formed the basis for a wide range of policies in the United States designed to protect

15  children from advertising that would take unfair advantage of youngsters' limited

16  comprehension of the nature and purpose of commercial appeals. These policies form

17  the foundation of a broad societal consensus that children require special treatment and

18  protection from the unbridled efforts of the economic marketplace."[18]

19      44.      The APA also noted, "An important side effect of the influence of

20  advertising on children's desire for products is the parent-child conflict that emerges

21  when refusals occur in response to children's purchase-influence attempts. Parents

22

23  [16]      JULIET B. SCHOR, BORN TO BUY, 120-122 (Scribner 2004).

24  [17]      Dale Kunkel & Jessica Castonguay, *Children and Advertising: Content,*
*Comprehension, and Consequences,* in HANDBOOK OF CHILDREN AND THE MEDIA, 2ND ED. at
25  36-37 (Dorothy Singer and Jerome Singer eds., Thousand Oaks, CA: Sage)
   (forthcoming).

26  [18]      American Psychological Association, REPORT OF THE APA TASK FORCE ON
27  ADVERTISING AND CHILDREN at 20 (2004), available at www.apa.org/pi/families/
   resources/advertising-children.pdf (internal citations omitted).

28

AMENDED CLASS ACTION COMPLAINT
CASE No. CGC-10-506178

9

1 obviously cannot honor all purchase requests triggered by television advertising, given

2 the volume of commercials that the average child sees. In one study, more than half of

3 children reported arguing or becoming angry when a toy request was denied; in

4 another, the study observed high rates of child disappointment and anger in response

5 to the majority of parent refusals for cereal requests at the supermarket. Other studies

6 confirm these patterns. In sum, the frequent purchase requests associated with

7 children's advertising exposure may place a strain on parent-child interaction.[19]

8     45.     Professor Juliet Schor, a noted expert on consumerism, economics, and

9 family studies, discusses the tension between the responsibilities of parents to make

10 efforts to guide their children's eating practices and the efforts of marketers to

11 undermine those very efforts. She notes that "a major thrust of contemporary marketing

12 to children is the interposition of the marketer between the parent and child. Marketers

13 create utopian spaces free of parents and employ insidious dual-messaging strategies.

14 Ads position the marketer with the child against the parent".[20]

15     46.     Professor Schor continues by noting "the undeniable fact of parental

16 responsibility does not imply that it's only parents who should be held responsible. The

17 complexities of life today render that approach far too simple-minded."[21]

18     47.     California children are deceived by marketing.

19     48.     Almost no child under the age of six understands marketing; they lack the

20 cognitive maturity to perceive its persuasive intent. For example, children under the age

21 of six believe television commercials are television programs. These effects persist, in

22

23

24

---

25 [19]     American Psychological Association, REPORT OF THE APA TASK FORCE ON ADVERTISING AND CHILDREN at 11 (2004), available at www.apa.org/pi/families/

26 resources/advertising-children.pdf (internal citations omitted).

27 [20]     J. Schor, BORN TO BUY at 161-162 (Scribner 2004).

[21]     J. Schor, BORN TO BUY at 184 (Scribner 2004).

28

AMENDED CLASS ACTION COMPLAINT
CASE No. CGC-10-506178

1   somewhat diminished degree but still at a significant level, until the children are older

2   than eight.

3        49.    Even the few children who may begin to understand persuasive intent of

4   commercials are not fully able to understand that marketing by self-interested

5   corporations influences their desires.

6        50.    "Comprehension of an advertiser's motives or intentions in conveying

7   commercial messages poses a mental challenge that children below roughly 8 years of

8   age are poorly equipped to handle. A younger child is more likely to focus on the

9   product featured in an advertisement, as opposed to thinking about the company that

10  produced it, or the abstract concept of their economic interests."[22]

11       51.    Thus, because these children do not understand marketing, they are

12  inherently deceived by the marketing, just as adults are deceived by deliberately

13  misleading marketing.

14       52.    Marketing poor-nutrition Happy Meals to California children leads them

15  to prefer, purchase, and pester their parents to buy poor-nutrition Happy Meals.

16       53.    Children influence their families' expenditures each year.[23] Children as a

17  consumer group, including those eight and younger, spend approximately $200 billion

18  each year themselves.[24] One-third of what they spend is on food and beverages.[25]

19

20

21

22  [22]    Dale Kunkel & Jessica Castonguay, *Children and Advertising: Content,*
*Comprehension, and Consequences,* in HANDBOOK OF CHILDREN AND THE MEDIA, 2ND ED. at
23  22 (Dorothy Singer and Jerome Singer eds., Thousand Oaks, CA: Sage) (forthcoming).

24  [23]    INSTITUTE OF MEDICINE, FOOD MARKETING TO CHILDREN: THREAT OR OPPORTUNITY?
1-4 (National Academies Press 2006).
25  [24]    INSTITUTE OF MEDICINE, FOOD MARKETING TO CHILDREN: THREAT OR OPPORTUNITY?
26  1-4 (National Academies Press 2006).
[25]    J.U. McNeal *Tapping the Three Kids' Markets, AMERICAN DEMOGRAPHICS* (April
27  1998), at 36, accessed on LexisNexis, February 9, 2006.

28

AMENDED CLASS ACTION COMPLAINT
CASE No. CGC-10-506178

54.     After being constantly bombarded with advertising for Happy Meals that often feature toys, California children then bombard their parents with requests for the toys and Happy Meals they have seen advertised.

55.     These requests sometimes lead parents to purchase poor-nutrition Happy Meal items they would otherwise not buy. Parham's daughters have requested Happy Meals from Parham because of McDonald's marketing practices, and sometimes Parham, not wishing to cause family rancor, purchases such meals.

56.     Most California children have no concept of what it means to eat a healthy diet.

57.     Children rely on outside sources, including parents, friends, and the media, full of powerful advertisements for poor-nutrition Happy Meals, to influence or determine what they should eat.[26]

58.     "Food and beverage marketing practices geared to children and youth are out of balance with healthful diets, and contribute to an environment that puts their health at risk."[27]

59.     The marketing of poor-nutrition Happy Meals to California children contributes to their desire to consume and request these products. This type of marketing affects children's short-term and long-term dietary intakes and their attitudes about nutrition.[28]

60.     Thus, the toy may appear to be "free," but consuming these meals has a high actual health cost.

---

[26]     INSTITUTE OF MEDICINE, FOOD MARKETING TO CHILDREN: THREAT OR OPPORTUNITY? 5-28 (National Academies Press 2006).

[27]     Dale Kunkel & Jessica Castonguay, *Children and Advertising: Content, Comprehension, and Consequences,* in HANDBOOK OF CHILDREN AND THE MEDIA, 2ND ED. at 36 (Dorothy Singer and Jerome Singer eds., Thousand Oaks, CA: Sage) (forthcoming).

[28]     INSTITUTE OF MEDICINE, FOOD MARKETING TO CHILDREN: THREAT OR OPPORTUNITY? 5-35-38 (National Academies Press 2006).

AMENDED CLASS ACTION COMPLAINT
CASE No. CGC-10-506178

1    61.    Moreover, according to Roy Bergold, who served as McDonald's

2   advertising head for twenty-nine years, "the toys usually aren't free—they're priced

3   into the meal and companies have found that kids are a lot more tempted by the toys

4   than the food."[29]

5    62.    For all of these reasons, McDonald's unfair and deceptive practice of

6   advertising Happy Meals to children by using the lure of a toy directly and proximately

7   inculcates poor dietary habits in California children, placing them at a lifelong risk of

8   developing a myriad of health problems.

9    63.    This in turn contributes to the rising cost of health care in this country.

10    64.    This marketing also interferes with and undermines parental control over

11   the health and welfare of their children.

12    65.    This action seeks to stop one of the most powerful, unfair, and deceptive

13   practices – tempting kids with toys to get them to nag their parents to buy Happy

14   Meals, thereby restoring an environment in which children and their parents can make

15   dietary choices free from unfair and deceptive child-targeted marketing.

16    66.    Fast-food companies – with McDonald's by far in the lead – spent over

17   $520 million on marketing and sales promotions, including toys, to advertise children's

18   meals.[30] Toy premiums made up almost three-quarters of those expenses, totaling over

19   $350 million. According to data from the NPD Group, fast food restaurants sold more

20   than 1.2 billion children's meals with toys to children ages 12 and under, accounting for

21   20% of all child traffic at those restaurants.[31] On information and belief, McDonald's

22

23

24   [29]   Bergold, Jr., Roy T. *"The Obesity Debate."* QSR Magazine 2 November 2010: n.

25   pag. Web. 2 November 2010, *available at* www.qsrmagazine.com/articles/columnist/
    roy_bergold/1110/obesity-1.phtml.

26   [30]   Federal Trade Commission, *Marketing Food to Children and Adolescents* at ES-3

27   (2008), available at www.ftc.gov/os/2008/07P064504foodmktingreport.pdf. The 2006
    data in this FTC report are the most recent available publicly.

28   [31]   *Ibid.*

                                    AMENDED CLASS ACTION COMPLAINT
                                    CASE No. CGC-10-506178

1  spends far more and distributes far more toys (along with poor-nutrition meals) than

2  any other fast food restaurant.

3       67.     McDonald's intent is clear, but internal documents make the intent even

4  clearer.

5       68.     One internal McDonald's document brags that "The ultimate goal is to

6  make McDonald's the overwhelming favorite restaurant to visit for adults, *just as it*

7  *already is for kids.*"[32]

8       69.     Another internal document is more specific: "*McDonald's has strong*

9  *appeal amon*g children *because of Happy Meals including fun toys, games, and prizes.*

10  McDonald's also attracts children with the . . . food (especially hamburgers,

11  cheeseburgers, and French fries) and the advertising. . . . *[C]hildren are more attracted*

12  *to McDonald's because of the Happy Meal promotion . . ..*".[33]

13       70.     By advertising Happy Meals with toys as bait, McDonald's unfairly and

14  deceptively markets directly to children. When McDonald's bombards children with

15  advertisements or other marketing for Happy Meals with toys, many children will

16  pester their parents repeatedly to take them to McDonald's, just so they can get the

17  current toy (usually a new one each week). Once there, the children are likely to receive

18  a meal that is too high in calories, saturated fat, added sugars, and sodium, and devoid

19  of whole grains. Developing a lifelong habit of eating unhealthy meals is likely to

20  promote obesity, high blood pressure, heart disease, diabetes, and other life-threatening

21  or debilitating diet-related diseases. These consequences are all caused by kids being

22  baited by a cheap toy.[34]

23

24

25  [32]    Source: McDonald's Management News, published for McDonald's owners/operators and store management.

26  [33]    Source: McDonald's Fast Track Report [emphasis added].

27  [34]    This complaint is limited to toys and other premiums sold with Happy Meals,

28  although we note that items for which consumers pay extra, like the since-recalled Shrek glasses, and the Mighty Meals aimed at older kids also contribute to the problem.

71.     Children in California spend as much time using screen media (television, videos, video games, and computers) as they spend playing outside.[35] Children under the age of six watch over an hour of television per day, and the amount of television watched increases with age.[36] Annually, children in California view tens of thousands of television commercials, with at least 30,000 commercials representing a common ceiling.[37] Approximately half of the commercials during children's programming (as classified by the Federal Communications Commissions) are for poor-nutrition food.[38] Children in California, therefore, see approximately 15,000 television commercials for poor-nutrition food each year. (Of course, they see a multitude of other food advertisements on the Internet, in restaurant windows, and elsewhere).

72.     Nearly all food advertisements viewed by children and adolescents are for products high in fat, sugar, or sodium,[39] and there is increasing evidence that the marketing of unhealthy food products is disproportionately targeted at ethnic minority children.[40]

---

[35]    Kaiser Family Foundation, *Zero to Six: Electronic Media in the Lives of Infants, Toddlers and Preschoolers* (2003), available at http://www.kff.org/entmedia/upload/Zero-to-Six-Electronic-Media-in-the-Lives-of-Infants-Toddlers-and-Preschoolers-PDF.pdf.

[36]    Kaiser Family Foundation, *Zero to Six: Electronic Media in the Lives of Infants, Toddlers, and Preschoolers* (21003), available at http://www.kff.org/entmedia/upload/Zero-to-Six-Electronic-Media-in-the-Lives-of-Infants-Toddlers-and-Preschoolers-PDF.pdf.

[37]    Dale Kunkel & Jessica Castonguay, *Children and Advertising: Content, Comprehension, and Consequences,* in HANDBOOK OF CHILDREN AND THE MEDIA, 2ND ED. at 6 (Dorothy Singer and Jerome Singer eds., Thousand Oaks, CA: Sage) (forthcoming).

[38]    INSTITUTE OF MEDICINE, FOOD MARKETING TO CHILDREN: THREAT OR OPPORTUNITY? 4-42 (National Academies Press 2006).

[39]    Children: 98%; adolescents: 89%.

[40]    Dale Kunkel & Jessica Castonguay, *Children and Advertising: Content, Comprehension, and Consequences,* in HANDBOOK OF CHILDREN AND THE MEDIA, 2ND ED. at 11-12 (Dorothy Singer and Jerome Singer eds., Thousand Oaks, CA: Sage) (forthcoming).

AMENDED CLASS ACTION COMPLAINT
CASE No. CGC-10-506178

73.   McDonald's is a leader in these forms of food advertising to young children. Its advertisements directed at young children generally focus on the Happy Meal toy and not on the food content of the Happy Meal.

74.   McDonald's is well aware of the impact of "pester power" on parents' purchasing decisions and uses it to its advantage by advertising Happy Meals with toys.

75.   For example, McDonald's founder Ray Kroc said that "if you had $1 to spend on marketing, *spend it on kids, because they bring* mom and dad."[41]

76.   The toy has been the key to successful marketing to children of Happy Meals. Joe Johnston, who was on the advertising-agency team in the early 1970s that invented McDonald's Fun Meal, which later became the Happy Meal once a toy was added, acknowledged that "Yes, even then, we knew that *we needed a toy to make it work*".

77.   A consultant for McDonald's brags, "McDonald's knows that by targeting families, it hits one of the most attractive, loyal consumer groups available. It gets into *the parents' wallets via the kids' minds*". Given the strength of this strategy, it's no wonder that McDonald's has become what it is.[42]

78.   McDonald's has a long history of targeting children and families. McDonald's Founder Kroc boasted, "we used to spot good locations for McDonald's stores by flying over a community and looking for schools and church steeples."[43]

---

[41]   Roy T. Bergold, Jr., "Is Obesity Really Our Fault?" QSR Magazine (June 2010), accessible at www.qsrmagazine.com/articles/columnists/roy_bergold/0610/obesity-1.phtml. Mr. Bergold was McDonald's advertising head for 29 years.

[42]   Martin Lindstrom, "Branding: Its [sic] All About Focus," available at www.martinlindstrom.com/index.php/cmsid__list_articles/__1159. Mr. Lindstrom advises McDonald's on all aspects of brand building including sensory branding, neuromarketing and optimization.
http://www.martinlindstrom.com/index.php/cmsid__consulting.

[43]   Kroc, Ray, *Grinding It Out: The Making of McDonald's,* p.176 (Contemporary Books, Inc. 1976).

AMENDED CLASS ACTION COMPLAINT
CASE No. CGC-10-506178

79.     The deceptive nature of McDonald's Happy Meals marketing is not debatable. Even industry insiders recognize it.

80.     The long-time head of McDonald's advertising recently commented that "Research says that *seven-year-olds and younger accept what we say in advertising as the truth.* Heck, three-year-olds can identify brands using just their corporate logos. According to a survey commissioned by the Center for a New American Dream back in 2002, the average kid asks his parent for something nine times before the parent gives in....*What's a mother to do under this assault?*"[44]

81.     "In an ideal world, perhaps parents would ignore all of children's requests for lavish toys and unhealthy snack foods, but, in fact, research is clear that parents have a high rate of yielding to children's purchase-influence requests. Moreover, most children begin to receive their own spending money as young as eight years of age, and one of the earliest products they are allowed to buy without explicit parental consent is snack foods."[45]

82.     After the Center for Science in the Public Interest (CSPI), lead counsel in this action, sent notice of intent to sue to McDonald's (in an unsuccessful effort to resolve this problem without litigation), a marketing-industry insider noted that "CSPI claims McD's violates several state consumer laws because advertising to kids is 'inherently deceptive, because young kids are not developmentally advanced enough to understand the persuasive intent of marketing.' *This, as a fact, is true.*"[46]

---

[44]     Roy T. Bergold, Jr., *supra.*

[45]     Dale Kunkel & Jessica Castonguay, *Children and Advertising: Content, Comprehension, and Consequences,* in HANDBOOK OF CHILDREN AND THE MEDIA, 2ND ED. at 33 (Dorothy Singer and Jerome Singer eds., Thousand Oaks, CA: Sage) (forthcoming).

[46]     Jim Edwards, "How McDonald's Happy Meal Will Survive This Perfect Storm of Child Abuse Accusations and Litigation." CBS Interactive (July 8, 2010), available at http://www.bnet.com/blog/advertising-business/how-mcdonald-8217s-happy-meal-will-survive-this-perfect-storm-of-child-abuse-accusations-and-litigaton/5156 [emphasis added]. Mr. Edwards is former managing editor of *Adweek* and has covered drug marketing at *Brandweek.*

AMENDED CLASS ACTION COMPLAINT
CASE No. CGC-10-506178

83.     It is also true that businesses that refuse to bribe children to drive their
profits are at a competitive disadvantage.

84.     Parents in California have almost no ability or opportunity to control
where and how their children view marketing. Marketing aimed at California children
is everywhere: on television, in magazines, on Web sites, on billboards, on school buses,
in restaurants, and in school cafeterias and on school vending machines.

85.     On information and belief, McDonald's is aware of the inability of
California children to understand the persuasive intent of marketing and its impact on
their decision-making. Yet, in California, McDonald's knowingly takes advantage of the
cognitive immaturity of children and advertises poor-nutrition Happy Meals to them,
often advertising "free" toys to make its marketing efforts particularly persuasive.

**IV.     McDonald's Advertising Directly, Proximately, and Cognizably Harms
California Children and Their Parents**

86.     California parents' lack of control over the marketing of Happy Meals to
their children strains their ability to raise healthy children and to instill healthy eating
habits in them.[47]

87.     McDonald's deceptively markets Happy Meals, continuing its decades-old
practice of advertising Happy Meals with toys to market directly to children in order to
bypass the parents and increase sales.

88.     After years of criticism of its marketing practices, McDonald's pledged to
the Better Business Bureau that it would advertise only Happy Meals that meet
McDonald's own nutrition standards for children (although those standards are weaker
than appropriate). However, that pledge fails to address McDonald's insidious use of
toys in advertising its products to children. Regardless of the Happy Meal combinations

---

[47]     JULIET B. SCHOR, BORN TO BUY 130-32, 160-65 (Scribner 2004).

1   shown in advertising, almost all Happy Meal combinations are nutritionally

2   inappropriate for very young children. Moreover, the default[48] choice for the side dish

3   tends to be the nutritionally poor French fries, not the less-harmful (but still not

4   healthy) Apple Dippers with sugary Caramel Dipping Sauce.[49]

5       89.     A reasonable lunch for a young child should contain no more than 430

6   calories (one-third of the 1,300 calories that is recommended daily intake for sedentary

7   children 4 to 8 years old)

8       90.     The pre-suit notice delivered to McDonald's on June 22, 2010, described

9   the problems set out in detail herein, describing the number of unhealthy meals thus:

10   McDonald's Web site lists 24 Happy Meal combinations. Considering that a reasonable

11   lunch for a young child would contain no more than 430 calories (one third of the 1,300

12   calories that is the recommended daily intake for children 4 to 8 years old), not a single

13   Happy Meal meets that target. The average of all 24 meals is 26 percent higher in

14   calories than a reasonable lunch. In fact, one meal (cheeseburger, French fries, and

15   chocolate milk) hits 700 calories — a whopping 63 percent higher (and more than half

16   the calories for the entire day).

17       91.     The source for these numbers was McDonald's own published Happy

18   Meals nutrition information available on its website, and dated June 2, 2010.

19       92.     Three days after it received the pre-suit notice, McDonald's altered this

20   data, reducing the amount of calories and sugar.[50]

---

[48]    A "default" item is one that the McDonald's employee includes in a Happy Meal
without asking.

[49]    Apple Dippers consist of apple slices and a sugary caramel dipping sauce,
effectively the kind of caramel apple one might buy a carnival.

[50]    Nutrition.mcdonalds.com/nutrionexchange/Happy_Meals_Nutrition_List.pdf
(last accessed December 14, 2010).

AMENDED CLASS ACTION COMPLAINT
CASE No. CGC-10-506178

93.     After McDonald's altered its own data, three of the 24 meals suddenly met the calorie target described in the pre-suit notice.

94.     Plaintiff has no idea why McDonald's would suddenly alter its own data in a manner that made these three meals appear healthier (but still not healthy — all 24 meals exceed 400 mg of sodium, one-third of the 1,200-milligram recommendation for sodium for children).

95.     In a CSPI study of 44 McDonald's outlets, the default Happy Meal almost always included French fries. In response to a request for a hamburger Happy meal, the McDonald's employee, without asking customers which side dish they wanted, provided fries 93 percent of the time.[51] (Beverage choices were usually offered, but a soft drink was the first option offered 78 percent of the time.)

96.     Thus, McDonald's claims it is serving up healthier options, but in fact it is not, for several reasons:

- The best-possible combination is still fried chicken and a caramel apple.[52]

- Although McDonald's briefly depicts the best-possible combinations in its advertising, those depictions are fleeting. It engages in bait-and-switch 93% of the time, substituting the far-more-unhealthy French fries for Apple Dippers. Indeed, many of McDonald's commercials aimed at very young children are intended to spur visits to McDonald's stores rather

---

[51]     Twenty-seven health and nutrition professionals visited 44 restaurants in 14 states. They purchased 41 Happy Meals inside of restaurants and 34 drive-throughs, for a total of 75 assessments.

[52]     This meal consists of four fried Chicken McNuggets and less than half of one small apple accompanied by caramel sauce, with less calories, saturated fat, and sodium than the other choices.

than to promote a particular food item…but, of course, the toys are heavily featured.

- On information and belief, the cost of McDonald's to produce an order of French fries is significantly less than the cost to produce the apples and dipping sauce for the Apple Dippers. Thus, McDonald's bait-and-switch practice is likely based largely on financial motives.

97. McDonald's duplicitous approach to marketing directed to children can be seen in a recent press release that boasts that the Company's Shrek-based promotion will "encourage kids to 'Shrek Out' their Happy Meals around the world with menu options like fruits, vegetables, low-fat dairy and fruit juices."[53] In reality, though, the whole point of the Shrek promotion is to get kids into McDonald's where they most likely will end up being served unhealthy default options and eating unhealthy meals.

98. Consider the Happy Meal composed of a cheeseburger, French fries, and chocolate milk. That meal has 700 calories (more than half a day's worth for sedentary young children), 9 grams of saturated fat (more than half the 14 gram recommended limit), 1,080 milligrams of sodium (more than three-fourths of the 1,200 milligram limit), and about twice the 16-gram recommended daily limit for added sugars. Furthermore, the bun is made with white flour, not the whole-wheat flour that is recommended for at least half a consumer's grain intake.

---

[53] www.aboutmcdonalds.com/mcd/media_center/recent_news/corporate/ Press_Release_McDonalds_Launches_Shrek_Themed_Happy_Meal_to_Motivate_Kids_ to_Eat_More_Fruits_Vegetables_and_Dairy.html

AMENDED CLASS ACTION COMPLAINT
CASE No. CGC-10-506178

21

## V.   Plaintiff's Experience

99.    Parham's daughters, ages two and six, continually clamor to be taken to McDonald's "for the toys."

100.    Parham's daughters have been deceived by McDonald's marketing practices.

101.    Parham's daughters do not understand that McDonald's marketing efforts are intended to make them want to eat Happy Meals. The girls interpret this marketing as good advice for proper eating.

102.    Often, Parham's daughters want Happy Meals because toys based on trusted characters from television and movies (such as Shrek) endorse the Happy Meals in McDonald's advertising.

103.    Some of the many toys that have induced Parham's daughters to clamor for Happy Meals and to pester Parham to purchase Happy Meals for the sake of obtaining a toy are:

- I-Carly lip gloss and note pad

- Various stuffed toys (intended for use by children under three)

- Barbie lip gloss and small comb

- Shrek movie character figures

- Strawberry Shortcake mini-dolls with paper and mini-stamps

- "American Idol" toy

104.    McDonald's marketing practices are unfair to Parham and the members of the Parents Class and both unfair and deceptive to Parham's daughters and other California children under the age of eight.

105.    McDonald's has unfairly influenced Parham's daughters. Its Happy Meals advertising aimed at children has influenced their desire for the toy and therefore their

desire to eat the poor-nutrition Happy Meals, thereby harming their health without their knowledge or comprehension.

106. When given the choice, Parham's daughters want to eat Happy Meals instead of fruits, vegetables, and whole grains because McDonald's has convinced them that they need to get the toy.

107. McDonald's marketing practices are unfair to Parham and members of the Parents Class.

108. One instance that is particularly frustrating to Parham, because it is outside of her control, is that her six-year-old daughter's friends are McDonald's viral marketers.

109. Parham's six-year-old daughter learns of Happy Meal toys from other children in her playgroup, despite Parham's efforts to restrict her exposure to McDonald's advertising and her access to Happy Meal toys.

110. This is McDonald's advertising directive – to subvert parental authority and mobilize pester power in order to sell unhealthful meals to kids using the lure of a toy.

111. McDonald's has unfairly interfered with Parham's relationship with her children.

112. Because of McDonald's marketing, Parham's daughters frequently pester Parham into purchasing Happy Meals, thereby spending money on a product she would not have otherwise purchased.

113. Parham often purchases each Happy Meal two times over, as her two-year-old daughter wants to follow her older sister's example, and becomes upset if she does not also receive a Happy Meal toy.

114. Although Parham frequently denies her daughters' repeated requests for Happy Meals, these denials have angered and disappointed her daughters, thus causing needless and unwarranted dissension in their parent-child relationship.

115. Parham's daughters' exposure to Happy Meal marketing has undermined Parham's parental authority, because while the advertisements result in her daughters' desire for poor-nutrition Happy Meals, as children, they lack the ability to decipher the promotional ploy and to understand why Parham will not generally buy them Happy Meals.

### CLASS ACTION ALLEGATIONS

116. Parham brings this action on behalf of herself and on behalf of all California residents who purchased Happy Meals during the Class Period and are parents of California children under the age of eight who have seen marketing for Happy Meals ("Parents Class").

117. Specifically excluded from the Parents Class are any entity in which McDonald's has a controlling interest, and the officers, directors, employees, affiliates, subsidiaries, legal representatives, heirs, successors and their assigns of any entity, together with any immediate family member of any officer, director or employee of said companies. Also excluded from the class is any judge or judicial officer presiding over this action and members of their families within the third degree of relationship.

118. The Parents class consists of at least 100,000 members. Thus, the class is too numerous to make it practicable to join all members as plaintiffs.

119. For the Parents class, there are questions of law and fact that are substantially similar and predominate over any questions affecting only individual class members. These issues include:

    a.    Whether McDonald's has engaged in unfair practices;

AMENDED CLASS ACTION COMPLAINT
CASE No. CGC-10-506178

24

b.      Whether McDonald's has engaged in deceptive practices;

c.      The extent to which members of the Parents Class have been injured as a result of these practices;

d.      Whether these practices render McDonald's in violation of California's Unfair Competition Law, California Business and Professions Code § 17200 and § 17500 *et seq.*; and California's CLRA § 1750 *et seq.*

120.    Parham's claims are typical of the claims of the Parents Class she seeks to represent.

121.    Parham will fairly and adequately protect the interest of the class. She intends to prosecute these claims vigorously and seek to obtain relief that would benefit the entirety of each class. She has no conflicts with their respective classes.

122.    Counsel for Parham are qualified to litigate the claims of each class.

123.    Common issues of law and fact predominate over issues affecting only individuals.

124.    A class action is superior to other available methods to resolve the controversies arising from McDonald's practices as the issues presented are both numerous and substantial. Thus, adjudication of the claims raised by means of a class action will provide substantial benefits to both the litigants and the court. Many of the members of the Parents Class are likely unaware of their legal rights. In the absence of class actions, many members of each class would not have their claims redressed.

125.    Therefore, Parham seeks certification pursuant to the Consumer Legal Remedies Act, California Civil Code § 1750, *et seq* and California Code of Civil Procedure § 382.

AMENDED CLASS ACTION COMPLAINT
CASE No. CGC-10-506178

# CLAIMS FOR RELIEF

## COUNT I

### ENGAGING IN UNFAIR MARKETING AND BUSINESS PRACTICES

**(Parham individually and as class representative)**

126.    It is unlawful to engage in unfair acts or practices while engaged in any trade or commerce in California. California Business and Professions Code § 17200 *et seq.*

127.    McDonald's violates the California Unfair Competition Law each time it markets Happy Meals to California children.

128.    Plaintiff has lost money or property because of Defendants' activities, and therefore has suffered an "injury in fact."

## COUNT II

### ENGAGING IN UNFAIR METHODS OF COMPETITION AND UNFAIR OR DECEPTIVE ACTS OR PRACTICES

**(Parham individually and as class representatives)**

129.    "Unfair methods of competition and unfair or deceptive acts or practices undertaken by any person in a transaction intended to result or which results in the sale or lease of goods or services to any consumer are unlawful." Consumer Legal Remedies Act California Civil Code § 1750, *et seq.* ("CLRA").

130.    The Happy Meals at issue are "goods" as defined by CLRA § 1761(a).

131.    Defendants are "persons" as defined by CLRA § 1761(c).

132.    Plaintiff and the Putative Class members are "consumers" as defined by CLRA § 1761(d).

133.    The purchase of Happy Meals by the Plaintiff and Putative Class members are "transactions" as defined by CLRA § 1761(e).

AMENDED CLASS ACTION COMPLAINT
CASE No. CGC-10-506178

134.    McDonald's advertising and selling Happy Meals with toys to very young children is prohibited pursuant to the CLRA because it is inherently deceptive and was "undertaken by any person in a transaction intended to result or which results in the sale or lease of goods or services to any consumer."

135.    McDonald's violates the CLRA by knowingly and intentionally advertising Happy Meals with toys to very young children.

136.    This unfair and deceptive practice violates CLRA § 1770(a)(5), which prohibits "Representing that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities which they do not have . . ."

137.    This unfair and deceptive practice is also a violation of CLRA § 1770(a)(7) which prohibits "Representing that goods or services are of a particular standard, quality, or grade, or that goods are of a particular style or model, if they are of another."

138.    McDonald's unfair and deceptive acts and practices have violated, and continue to violate the CLRA, because they extend to transactions that are intended to result, or have resulted, in the sale or lease of goods or services to consumers, including the Plaintiff and the Putative Class members.

139.    As a direct and proximate result of McDonald's unfair and deceptive acts and practices, the Plaintiff and the Putative Class members have suffered damage in that they purchased deceptively advertised and unhealthy Happy Meals.

140.    Plaintiff would not have bought Happy Meals but for McDonald's deceptive marketing to very young children with a toy.

AMENDED CLASS ACTION COMPLAINT
CASE No. CGC-10-506178

27

## COUNT III

### ENGAGING IN UNLAWFUL METHODS OF COMPETITION AND UNFAIR OR DECEPTIVE ACTS OR PRACTICES

#### (Parham individually and as class representatives)

141.    McDonald's acts and practices constitute unlawful business acts and practices.

142.    McDonald's marketing with toys and other inducements is inherently deceptive to very young children.

143.    McDonald's business practices alleged above are unlawful under the CLRA, which forbids deceptive advertising, among other things. By violating the CLRA, McDonald's has committed unlawful acts and have violated California Business and Professions Code § 17200 *et seq.*

### RELIEF REQUESTED

Plaintiffs, individually and on behalf of all others similarly situated, respectfully request that the Court:

1.    Certify the claims to be asserted as a class action pursuant to the Consumer Legal Remedies Act, California Civil Code § 1750, *et seq* and California Code of Civil Procedure § 382.

2.    Declare that McDonald's advertising acts and practices violate the California Unfair Competition Law and the California Consumer Legal Remedies Act.

3.    Enjoin McDonald's from continuing to advertise Happy Meals to California children featuring toys.

4.    Award costs and attorney's fees, in an amount to be determined at trial.

5.    Order McDonald's to pay reasonable costs, attorneys' fees, and expert fees.

6.    Grant all other relief that the Court deems just and proper.

AMENDED CLASS ACTION COMPLAINT
CASE No. CGC-10-506178

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## JURY REQUEST

PLAINTIFFS REQUEST A TRIAL BY JURY AS TO ALL ISSUES SO TRIABLE.

Dated January 5, 2011

Baker Law, P.C.
2229 1st Avenue North
Birmingham, AL 35203
G. Richard Baker, Esquire

Center for Science in the
Public Interest
5646 Milton Street, Suite
211
Dallas, TX 75206
Stephen Gardner, Esquire
Seema Rattan, Esquire

AMENDED CLASS ACTION COMPLAINT
CASE No. CGC-10-506178

# EXHIBIT B

Westlaw.

37 Trials Digest 12th 6                                                                                    Page 1


37 Trials Digest 12th 6 (Cal.Superior), 2009 WL 2736967
For Opinion See 2009 WL 3169396 (Trial Order), 2005 WL 5191258 (Trial Order)


Copyright (c) 2010 Thomson Reuters/West

Superior Court, San Francisco County, California.

Gutierrez vs. Autowest Inc.

TOPIC:
Synopsis: Class members claim company violated California Vehicle Leasing Act
Case Type: Consumer Protection; False Advertising; Contracts; Leased Goods; Class Action

DOCKET NUMBER: CGC05317755

STATE: California
COUNTY: San Francisco

Verdict/Judgment Date: February 25, 2009

JUDGE: James A. Robertson II

ATTORNEYS:
Plaintiff: Nancy Barron, Kemnitzer, Anderson, Barron & Ogilvie, San Francisco; Christopher Jennings, Kemnitzer, Anderson, Barron & Ogilvie, San Francisco; Bryan Kemnitzer, Kemnitzer, Anderson, Barron & Ogilvie, San Francisco.
Defendant: Laura K. Christa, Christa & Jackson, Los Angeles; Martin L. Fineman, Davis Wright Tremaine, San Francisco; Paul M. Kakuske, Christa & Jackson, Los Angeles; Regina J. McClendon, Severson & Werson, San Francisco.

SUMMARY:
Verdict/Judgment: Plaintiff
Verdict/Judgment Amount: $153,126

Range: $100,000-$199,999

Defendant Autowest was ordered to pay $82,848 to the class and $70,278 to plaintiffs Ryan and Jamie Gutierrez, jointly ($18,426 for violations of the California Legal Remedy Act, $36,852 for punitive damages, and $7,500 as an incentive award). Defendant Autowest was also ordered to pay $1,494,988 in **attorney fees** and $63,265 in costs.
Trial Type: Bench

EXPERTS:
Plaintiff: Not reported.
Defendant: Not reported.

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

TEXT:
CASE INFORMATION
FACTS/CONTENTIONS

According to court records: Plaintiffs Ryan and Jamie Gutierrez alleged defendants Autowest Inc., dba Autowest
Dodge; AutoNation USA Corporation; and Wells Fargo Bank Ltd., violated the California Vehicle Leasing Act,
Civil Code § 2885.7 et seq. and the California **Consumer Legal Remedies Act**, Civil Code § 1750 et seq.
Plaintiffs filed a lawsuit on behalf of themselves and other class members who entered into vehicle lease agree-
ments with defendant Autowest from March 1, 1998 through March 1, 2001.
On April 13, 2007, the court certified the class of persons who: (1) entered into a vehicle lease agreement
primarily for personal, family, or household use with Autowest Dodge from March 1, 1998 through November
1, 2001, in which the agreement was drafted on a Wells Fargo lease form; (2) the copy of the lease agreement
failed to contain a separate statement labeled "itemization of Gross Capitalized Cost" circumscribed by a line
and containing the disclosures required by Civil Code § 2985.8(c)(2) at the time it was signed by the consumer;
or (3) Autowest obtained the customer's signature on a copy of the lease agreement that contained blank spaces
to be filled in after it had been signed.

CLAIMED INJURIES
NA

CLAIMED DAMAGES
According to court records:
Not reported.

SETTLEMENT DISCUSSIONS
According to court records:
Not reported.

COMMENTS
According to court records:
The complaint was filed on December 29, 2000.

Trials Digest, A Thomson Reuters/West business

San Francisco County Superior Court

37 Trials Digest 12th 6 (Cal.Superior), 2009 WL 2736967

END OF DOCUMENT

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.



36 Trials Digest 12th 2 (Cal.Superior), 2009 WL 2595961
For Opinion See 2009 WL 3169400 (Trial Order), 2009 WL 3169397 (Trial Order), 2009 WL 3169399 (Trial Order), 2009 WL 3169398 (Trial Order)

Copyright (c) 2010 Thomson Reuters/West

Superior Court, San Francisco County, California.

Wilkinson vs. S&C Ford Inc.

TOPIC:
Synopsis: SETTLEMENT -- Woman sues under **CLRA** for denial of insurance claim
Case Type: Consumer Protection; Other; Insurance; Automobile Policy; Insurance; Bad Faith & Coverage; Unfair Competition & Business Practices; Other

DOCKET NUMBER: CGC06458397

STATE: California
COUNTY: San Francisco

Verdict/Judgment Date: May 21, 2009

JUDGE: Peter J. Busch

ATTORNEYS:
Plaintiff: Kim E. Card, Law Offices of Kim E. Card, Berkeley; Wesley M. Lowe, Mannion & Lowe, San Francisco; E. Gerard Mannion, Mannion & Lowe, San Francisco.
Defendant: Thomas M. Crowell, Toschi, Sidran, Collins & Doyle, Oakland; Terry S. Dall, Dall Law Firm, Mission Viejo; Mohammed S. Mandegary, Tressler, Soderstrom, Maloney & Priess, Costa Mesa; Kristin L. Moran, Dall Law Firm, Mission Viejo; Linda Bondi Morrison, Tressler, Soderstrom, Maloney & Priess, Costa Mesa; David R. Sidran, Toschi, Sidran, Collins & Doyle, Oakland.

SUMMARY:
Verdict/Judgment: Settlement
Verdict/Judgment Amount: $85,000

Range: $50,000-$99,999

Plaintiff settled with defendant ANPCC for $50,000 on May 21, 2009 and defendants S&C for $35,000 on March 13, 2009. The court awarded plaintiff $158,746 in mandatory **attorney fees** under the **Consumers Legal Remedies Act**.
Trial Type: Settlement

EXPERTS:
Plaintiff: Not reported.

Defendant: Not reported.

TEXT:
CASE INFORMATION
FACTS/CONTENTIONS

According to court records: On October 7, 2005, plaintiff Constance Wilkinson purchased a 2005 Ford Mustang from defendants S&C Ford Inc. and S&C Motors. Plaintiff said she also purchased insurance coverage for the Mustang. On December 2, 2005, the Mustang was involved in an accident and was totaled.
Plaintiff submitted a claim to defendants Carousel Insurance Services Inc. ("CIS"), American National Property & Casualty Company ("ANPCC"), E.L. Rudy Insurance Services, and Eric Lance Rudy, but the claim was denied.
Plaintiff alleged she complied with all necessary terms and conditions and that defendants failed to procure, obtain, and arrange the insurance coverage they had represented they would obtain. Plaintiffs alleged defendants acted in bad faith.

CLAIMED INJURIES
NA

CLAIMED DAMAGES
According to court records:
Not reported.

SETTLEMENT DISCUSSIONS
According to court records:
Plaintiff accepted defendant S&C's CCP § 998 offer of $35,000 on March 13,2009.

COMMENTS
According to court records:
The complaint was filed on December 4, 2006.
Terry S. Dall and Kristin L. Moran represented defendants CIS and ANPCC. Linda Bondi Morrison and Mohammed S. Mandegary represented defendant ANPCC. David R. Sidran, Thomas M. Crowell, and Kim E. Card represented defendants S&C and PCG Rhode Island, erroneously sued as S&C Motors Inc.

Trials Digest, A Thomson Reuters/West business

San Francisco County Superior Court

36 Trials Digest 12th 2 (Cal.Superior), 2009 WL 2595961

END OF DOCUMENT

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Westlaw.

44 Trials Digest 10th 7

Page 1

44 Trials Digest 10th 7 (Cal.Superior), 2007 WL 3116582
For Opinion See 2006 WL 4937162 (Trial Order), 2006 WL 4937164 (Trial Order)

Copyright (c) 2010 Thomson Reuters/West

Superior Court, San Diego County, California.

Brown vs. Edgewater Powerboats LLC

**TOPIC:**
Synopsis: Boat buyer says vessel defective, manufacturer, dealer responsible
Case Type: Consumer Protection; Lemon Law; Fraud & Misrepresentation; Fraud

**DOCKET NUMBER:** GIC857249

**STATE:** California
**COUNTY:** San Diego

Verdict/Judgment Date: May 23, 2007

**JUDGE:** Patricia Y. Cowett

**ATTORNEYS:**
Plaintiff: Ira James Harris, Law Offices of Ira James Harris, Orinda.
Defendant: Mark S. Bagula, The Watkins Firm, San Diego; Timothy D. Lucas, Parker & Stanbury, San Diego;
Stephen D. Lucas, Lucas & Haverkamp, San Diego; Teresa Powell, The Watkins Firm, San Diego.

**SUMMARY:**
Verdict/Judgment: Plaintiff
Verdict/Judgment Amount: $457,000

Range: $200,000-499,999

Plaintiff settled with defendant Boat Depot for $150,000 before trial. $174,000 violation of the Song-Beverly
Consumer Warranty Act, reduced by $18,500 for plaintiff's usage; $240,500 civil penalty for willful violation of
Song-Beverly Consumer Warranty Act; $5,000 negligence; $20,000 violation of warranties; $18,500 violation of
the **Consumer Legal Remedies Act**; $10,000 additional damages; $7,500 for 5 percent of defendant Boat Depot
settlement. The court then reduced the award by the allocated settlement with defendant Boat Depot. The court
reduced the award by $10,000 for the value of the boat, $90,000 for the loss of use. The court then awarded
$38,461 in costs and $305,935 in **attorney fees**, which were offset by $50,000 in costs and fees from the settle-
ment with defendant Boat Depot, and entered a total judgment in the amount of $651,396.
Trial Type: Jury
Trial Length: Not reported.
Deliberations: Not reported.

Jury Poll: Not reported.

EXPERTS:
Plaintiff: Conrad Christensen, P.E., corrosion engineer, Alamo, (925) 930-7222.
Defendant: Gordon E. Lakso, metallurgist, Lafayette.; Todd Schwede, marine surveyor, Todd & Associates, San Diego, (619) 226-1895.

TEXT:
CASE INFORMATION
FACTS/CONTENTIONS

According to Plaintiff: Plaintiff Dwight Deacon Brown owned a defendant Edgewater Powerboats LLC's 2004 power boat. Plaintiff purchased the boat from defendant Boat Depot Inc. on Sept. 29, 2004 for $62,441. Plaintiff said the boat emitted a strange noise, which defendant Boat Depot was unable to fix. Plaintiff said the boat took on large quantities of water on at least two occasions. After the first incident, defendant Boat Depot attempted to repair the boat, but was unsuccessful and the boat again took on water. Plaintiff said he demanded a refund, but both defendants refused to communicate with him.
Plaintiffs alleged violation of the Song-Beverly Consumer Warranty Act, fraud, and negligence.
Defendant Edgewater contended the damage to the boat was caused by plaintiff's failure to check if the trolling-motor control switch was properly attached to the Velcro attachment point. Defendant Edgewater also contended defendant Boat Depot contributed to the damage by ignoring the manufacturer's recommendations and installing the trolling-motor control switch in a place where it could easily fall into the bilge area of the boat.

CLAIMED INJURIES
NA

CLAIMED DAMAGES
According to Plaintiff: $154,570 to $306,270 lost use; $58,873 cost of boat; $3,569 upgrades; $6,836 incidental damages.

SETTLEMENT DISCUSSIONS
According to Plaintiff: Not reported.

COMMENTS
According to Plaintiff: The complaint was filed on Nov. 18, 2005.
Stephen D. Lucas represented defendant Edgewater Powerboats. Timothy D. Lucas, Teresa Powell, and Mark S. Bagula represented defendant Boat Depot.

Trials Digest, A Thomson/West business

San Diego County Superior Court/Central

44 Trials Digest 10th 7 (Cal.Superior), 2007 WL 3116582

END OF DOCUMENT

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.



22 Trials Digest 10th 5 (Cal.Superior), 2004 WL 5324822
For Opinion See 2004 WL 5280217 (Trial Order), 2004 WL 5280218 (Trial Order), 2004 WL 5280216 (Trial
Order), 2004 WL 5280220 (Trial Order), 2004 WL 5280221 (Trial Order), 2004 WL 5280219 (Trial Order)

Copyright (c) 2010 Thomson Reuters/West

Superior Court, Los Angeles County, California.

McClanahan vs. Fleetwood

TOPIC:
Synopsis: Buyers of motor home sue for "lemon"
Case Type: Consumer Protection; Lemon Law; Fraud & Misrepresentation; Negligent Misrepresentation; Fraud
& Misrepresentation; Business; Unfair Competition & Business Practices; Business Interference

DOCKET NUMBER: VC038269

STATE: California
COUNTY: Los Angeles

Verdict/Judgment Date: October 13, 2004

JUDGE: John A. Torribio

ATTORNEYS:
Plaintiff: Christopher P. Barry, Rosner, Law & Mansfield, San Diego; Hallen D. Rosner, Rosner, Law & Mans-
field, San Diego.
Defendant: Jason M. Frank, Paul, Hastings, Janofsky & Walker, Los Angeles; Paula M. Harrelson, Prenovost,
Normandin, Bergh & Dawe, Santa Ana; Thomas M. Murphy, Sutton & Murphy, Mission Viejo; Tom Roddy
Normandin, Prenovost, Normandin, Bergh & Dawe, Santa Ana; Ronald M. Oster, Paul, Hastings, Janofsky &
Walker, Los Angeles; Thomas Prenovost, Prenovost, Normandin, Bergh & Dawe, Santa Ana.

SUMMARY:
Verdict/Judgment: Plaintiff
Verdict/Judgment Amount: $304,600

Range: $200,000-499,999

$204,600 against Freightliner Custom Chassis Corporation and Fleetwood Motor Homes, plus $100,000 civil
penalty against Freightliner Custom Chassis. The court granted plaintiffs $13,025 in costs; $45,516 pre-
judgment interest, and $117,713 in **attorney fees**. Judgment for defendant Cummins Engine Company, plus
$1,558 in costs. Judgment for defendant Mike Thompson's Recreational Vehicles, plus $2,914 in costs.
Trial Type: Jury
Trial Length: Not reported.

Deliberations: Not reported.
Jury Poll: Not reported.

EXPERTS:
Plaintiff: Not reported.
Defendant: Not reported.

TEXT:
CASE INFORMATION
FACTS/CONTENTIONS

According to Plaintiff: On January 18, 2001, plaintiffs Susan M. and Brian A. McClanahan went to defendant Mike Thompson's Recreational Vehicles to purchase a new motor home. Plaintiffs selected a 2001 Discovery 36T. Plaintiffs filled out and signed a credit application in order to obtain financing. Plaintiffs gave defendant a $2,000 post-dated check. Plaintiffs signed a Motor Vehicle Purchase Order on January 18, 2001 for the vehicle. As part of the purchase, plaintiffs agreed to trade in their 1998 Dolphin motor home. Plaintiffs owed approximately $69,950 on their trade-in motor home, but were credited with a value of $82,000 on the purchase contract. Unknown to plaintiffs, defendant appraised their trade-in motor home at approximately $52,000. The $30,000 over-allowance was then rolled into the cash price of the vehicle without plaintiffs' knowledge.

Plaintiffs alleged that defendant violated state and federal financial disclosure laws by rolling in the over-allowance on plaintiffs' trade-in motor home to the cash price of the vehicle. Defendant also failed to give plaintiffs a copy of their credit application as required by various state laws.

Defendant's express warranties accompanied the sale of the vehicle to plaintiffs by which defendant undertook to preserve or maintain the utility or performance of plaintiffs' vehicle or provide compensation if there were a failure in such utility or performance.

Plaintiffs alleged that the vehicle was delivered to them with serious defects and nonconformities to warranty and developed other serious defects and nonconformities to warranty, including engine overheating, check engine light coming on, power steering noise, coach batteries dying, air brake light coming on, slide-out misaligned, leak in skylight, back safety window inoperable, defective fresh water system, defective refrigerator, and other defects.

Plaintiffs alleged violation of the Song-Beverly Consumer Warranty Act, violation of the Magnuson-Moss Warranty Act, violation of the Automobile Sales Finance Act, violation of the **Consumers Legal Remedies Act**, commission of Unlawful, Unfair, or Fraudulent Business Acts and Practices (Business and Professions Code § 17200, et seq.), Injunctive and Equitable Relief, negligent repair, negligent misrepresentation, and negligence.

Other named defendants were Fleetwood Motor Homes of Indiana Inc.; Freightliner Custom Chassis Corporation; and Cummins Engine Company Inc.

CLAIMED INJURIES
NA

CLAIMED DAMAGES
According to Plaintiff: Not reported.

SETTLEMENT DISCUSSIONS
According to Plaintiff: Not reported.

COMMENTS

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

According to Plaintiff: The complaint was filed on October 9, 2002.
Thomas M. Murphy represented defendant Fleetwood Motor Homes. Ronald M. Oster, Jason M. Frank, Thomas Prenovost, Tom Roddy Normandin, and Paula M. Harrelson represented Mike Thompson's Recreational Vehicles. Thomas M. Murphy represented Fleetwood Motor Homes.

Trials Digest, A Thomson/West business

Los Angeles County Superior Court/Norwalk

22 Trials Digest 10th 5 (Cal.Superior), 2004 WL 5324822

END OF DOCUMENT

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Westlaw.

41 Trials Digest 5th 3                                                                        Page 1

41 Trials Digest 5th 3 (Cal.Superior), 2002 WL 31412474
For Dockets See 1-01-CV-797905

Copyright (c) 2010 Thomson Reuters/West

Superior Court, Santa Clara County, California.

Kloppenborg vs. Auto First Financial

TOPIC:
Synopsis: SETTLEMENT--Used car buyer sues for consumer fraud
Case Type: Contracts; Purchase of Goods; Automobile; Fraud; Failure to Disclose

DOCKET NUMBER: CV797905

STATE: California
COUNTY: Santa Clara

Verdict/Judgment Date: May 1, 2002

JUDGE: Jamie Jacobs-May

ATTORNEYS:
Plaintiff: Jon P. Jacobs, Law Offices of Sharon Kinsey, Soquel.; Carole K. Johnston, Law Offices of Sharon
Kinsey, Soquel.; Amanda K. Wilson, Law Offices of Sharon Kinsey, Soquel.
Defendant: Kevin Anderson, Anderson & Burrow, San Jose.; Lance Burrow, Anderson & Burrow, San Jose.

SUMMARY:
Verdict/Judgment: Settlement
Verdict/Judgment Amount: $33,500

Range: $1-$49,999

The amount of the settlement paid off plaintiff's loan. The parties agreed that plaintiff's reasonable **attorney fees**
and costs could be determined by the court. The court awarded $115,554 in reasonable fees and costs.
Trial Type: Not Applicable
Trial Length: Not Applicable

EXPERTS:
Plaintiff: Robert Malpede, automotive consultant, Bay Automotive Consultants, Aptos, (831) 685-8203.
Defendant: Not reported.

FOR RELATED TRIAL DOCUMENTS SEE:
Answer of Auto First Financial, d.b.a. Los Gatos Auto Mall: 2001 WL 34786356
Complaint for Damages and Injunction • Fraud in the Inducement to Contract; • Violation of **Consumers Legal**

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

**Remedies Act**; • Breach of Commercial Code Express Warranty; and • Violation of Unfair Business Practices Act.: 2001 WL 34786375

TEXT:
CASE INFORMATION
FACTS/CONTENTIONS

According to Plaintiff: A used car buyer sued the seller for consumer fraud for failure to reveal a prior accident. The plaintiffs were Rodina Kloppenborg, a 28-year-old promotions and incentives manager at Covad Communications. The defendant was Auto First Financial dba Los Gatos Auto Mall. Plaintiff purchased a used 1995 BMW 325is from defendant. The dealer did not disclose that the vehicle had been in a prior serious accident that caused extensive front end and frame damage and left the BMW without a functioning air bag. Plaintiff alleged that defendant had a duty to disclose these facts, as defendant was aware of the damage and had sent the vehicle to a body shop to have the frame pulled, cut, and welded. Plaintiff also alleged that defendant covered the repairs with undercoating to actively conceal its acts.
Defendant contended that plaintiff bought 'as is' and thus it had no duty to disclose.

CLAIMED INJURIES
NA

CLAIMED DAMAGES
According to Plaintiff: $34,000.

SETTLEMENT DISCUSSIONS
According to Plaintiff: At mediation, plaintiff demanded rescission plus **attorney fees**. Defendant offered $20,500. At the first mandatory settlement conference, plaintiff demanded $31,000 plus a fee petition of $115,554. Defendant offered $25,000. The matter settled at the second mandatory settlement conference for $33,500 plus the fee petition.

Trials Digest, A Thomson/West business

Santa Clara County Superior Court

41 Trials Digest 5th 3 (Cal.Superior), 2002 WL 31412474

END OF DOCUMENT

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

# EXHIBIT 2

1  RANDALL R. ALLEN (SBN 264067)
   randall.allen@alston.com
2  PALANI P. RATHINASAMY (SBN 269852)
   palani.rathinasamy@alston.com
3  **ALSTON & BIRD LLP**
   275 Middlefield Road, Suite 150
4  Menlo Park, CA 94025-4008
   Telephone:    650-838-2000
5  Facsimile:    650-838-2001

6  Attorneys for Defendants
   MCDONALD'S CORPORATION and
7  MCDONALD'S USA, LLC.

8

9               UNITED STATES DISTRICT COURT

10             NORTHERN DISTRICT OF CALIFORNIA

11                 SAN FRANCISCO DIVISION

12

13  MONET PARHAM, on behalf of herself and        Case No.:
    those similarly situated,
14                                                **DECLARATION OF PETER STERLING**
15                Plaintiff,                      **IN SUPPORT OF MCDONALD'S**
                                                  **NOTICE OF REMOVAL**
16         v.                                     **[REDACTED VERSION]**

17  McDONALD'S CORPORATION, and
    McDONALD'S USA, LLC.,
18
                  Defendants.
19

20

21

22

23

24

25

26

27

28

DECLARATION OF PETER STERLING IN SUPPORT OF                    1                         CASE NO. _____

# DECLARATION OF PETER STERLING

I, PETER STERLING, declare:

    1.    My name is Peter Sterling. I am over the age of 18 and base this declaration on my personal knowledge of the facts discussed herein. This declaration is given in support of the Notice of Removal of Defendants McDonald's Corporation and McDonald's USA, LLC (collectively, "McDonald's").

    2.    I am Vice President of Marketing for McDonald's and have served in that capacity for nine years. I have been with McDonald's since 1990. In this position, I am familiar with McDonald's Happy Meal program and its associated costs, including costs related to the toys, packaging and advertising. I have reviewed Plaintiff's Amended Complaint and am aware that Plaintiff seeks, among other things, a declaration that McDonald's Happy Meal advertising violates certain consumer protection laws in California and an injunction to prevent "McDonald's from continuing to advertise Happy Meals to children featuring toys" in California (*See* Am. Compl., Relief Requested ¶3). In the paragraphs below, I have assessed the potential costs to McDonald's if a court were to grant the requested relief.

    3.    McDonald's Corporation and McDonald's USA, LLC are both incorporated in Delaware. Furthermore, each is headquartered in Oak Brook, Illinois and McDonald's out-of-state operations are supervised from these headquarters. Additionally, the majority of McDonald's executive and administrative functions are performed at its headquarters in Oak Brook, Illinois. Thus, McDonald's principal place of business is Oak Brook, Illinois.

    4.    As of December 31, 2010, there were 14,043 McDonald's restaurants in the United States. California alone had 1,337 McDonald's restaurants as of December 31, 2010. Thus, McDonald's California locations comprise approximately 9.5% of the total McDonald's restaurants in the United States.

    5.    In the average year, approximately ███████ Happy Meals are sold in California. McDonald's sold ██████ Happy Meals in California in 2009 and 2010 respectively.

//

1     6.     McDonald's Happy Meals, including those sold in California, currently include a

2  choice of a hamburger, cheeseburger, or Chicken McNuggets; a beverage choice of either low-fat

3  white or low-fat chocolate milk, apple juice, or a 12oz. drink; a side item choice of Apple Dippers

4  or French fries; and a toy.

5     7.     If a court were to grant to the relief requested in the Amended Complaint, the

6  amount in controversy, would exceed $5 million.  McDonald's calculates that the cost of

7  complying with the injunction would be ███████████.

8                              **TELEVISION ADVERTISING**

9     8.     McDonald's and its franchisees currently advertise the Happy Meal on television

10  using national campaigns.  That is, McDonald's and its franchisees buy advertising space from

11  cable stations to run Happy Meal advertisements on a nationwide basis.  As a result, every market

12  – including California – sees the same Happy Meal advertisements.

13     9.     The Happy Meal television advertising campaign depicts a meal consisting of four-

14  piece Chicken McNuggets, Apple Dippers, low-fat white milk and a toy.

15     10.     If McDonald's were enjoined from advertising Happy Meals with toys in

16  California, McDonald's and its franchisees would have to change the practice of purchasing

17  nationwide advertising for the Happy Meal program.  Cable stations do not have the ability to

18  "block" or otherwise prevent nationwide advertising from running in California.  In other words,

19  McDonald's and its franchisees cannot simply instruct the cable stations not to run Happy Meal

20  advertisements that do not feature toys in California, while continuing to run national

21  advertisements in the rest of the country with Happy Meals featuring toys.

22     11.     In order to run separate Happy Meal advertising that does not feature toys in

23  California, while advertising Happy Meals with toys in the rest of the country (thereby replicating

24  McDonald's current advertising reach), McDonald's and its franchisees would have to purchase

25  all of its Happy Meal advertising on a local and regional basis rather than on a nationwide basis.

26     12.     Local and regional advertising space on cable channels is much more expensive

27  than national advertising on an aggregate basis.  Specifically, it would cost McDonald's and its

28  franchisees ████████ more to buy advertising on a local and regional basis as opposed to on

DECLARATION OF PETER STERLING IN SUPPORT OF                    2                    CASE NO. _____

1    a nationwide basis.

2         13.    It is ███████ more expensive to purchase advertising on a local or regional

3    basis because such advertising requires McDonald's and its franchisees to buy time from

4    numerous individual local and regional stations, cable operators, and third-party sellers as opposed

5    to making one national purchase.

6         14.    McDonald's national Happy Meal advertising is purchased by a cooperative

7    composed of the owner/operators of the restaurants.  Through its subsidiaries, McDonald's owns

8    and operates 11% of the restaurants in the U.S., and the remaining 89% of the restaurants are

9    franchised to independent owner/operators.  McDonald's, therefore, would incur 11% of the cost

10   increase described in paragraphs 12 and 13 above, which amounts to ███████.

11        15.    To summarize, if McDonald's were enjoined from advertising Happy Meals with

12   toys in California, McDonald's would incur an additional expense of ███████ to replicate its

13   current advertising reach.  This does not include the loss of ratings guarantees, advertising

14   positioning within blocks of advertising ("pods"), flexibility, and competitive separation, all of

15   which McDonald's would suffer should the Court enter Plaintiff's injunction.

16                                        **TOYS**

17        16.    The development and manufacture of McDonald's Happy Meal toys occurs well in

18   advance of their inclusion in Happy Meals.   For example, McDonald's has already developed and

19   authorized the manufacture of toys for the next twelve months.  Approximately ███████ of those

20   toys are intended for use by McDonald's restaurants in California.

21        17.    There are multiple steps between selecting a particular Happy Meal toy and

22   ultimately having toys in the restaurants for inclusion in Happy Meals.  Those steps include (but

23   are not limited to) licensing, designing the toys, manufacturing, shipping the toys to the U.S., and

24   distributing the toys to individual restaurants.  At any given point in time, a number of different

25   Happy Meal toys are in various stages of this process.

26        18.    After the toys are licensed and designed, McDonald's suppliers contract for the

27   manufacture of the toys.  A supplier then sells the toys to distribution centers, who in turn sell the

28   toys to individual McDonald's restaurants for inclusion in the Happy Meals.  It costs McDonald's

DECLARATION OF PETER STERLING IN SUPPORT OF                    *A*                    CASE NO. _____

1   restaurants ███████ to purchase a single toy.  This cost includes, but is not limited to, the raw

2   materials to make the toy, labor, safety testing, quality assurance, transport and packaging.

3         19.   At any given time, at least one year's worth of toys are in the chain of production

4   so that McDonald's and its franchisees would lose the cost of the toy if a court prevented

5   McDonald's from including toys in California's Happy Meals.[1]

6         20.   McDonald's could not attempt to recoup any of these losses by selling the toys to

7   another business.  The licensing agreements governing the use of the toys limit their use to

8   inclusion in Happy Meals.  These toys would have to be destroyed.

9         21.   Because ███████ toys at a cost of ██████ each are destined for California, if

10   granting the requested relief prevented McDonald's from including toys in Happy Meals,

11   McDonald's would have to incur a loss for a portion of the ██████ it spent on toys that could

12   no longer be used in California.

13         22.   Specifically, McDonald's would have to incur a loss of at least ██████ of the

14   ██████ (11% of ██████) because through its subsidiaries, McDonald's owns and operates

15   11% of the restaurants in the U.S.

16         23.   There are also fixed costs associated with the development of each Happy Meal

17   toy.  Such costs include costs associated with licensing, designing and developing the toys.  If

18   McDonald's were enjoined from including toys in its California Happy Meals, it would have to

19   bear a larger portion of these fixed costs.

20         24.   At the present time, toys are included with Happy Meals in restaurants in all fifty

21   states and in the District of Columbia.  If a court were to prevent McDonald's from including toys

22   in Happy Meals in California, the fixed costs related to producing toys would have to be spread

23   across restaurants in forty-nine states, plus the District of Columbia, instead of restaurants in fifty

24   states.  The cost of the toys to the restaurants in the forty-nine states and D.C. would increase by

25   1.2 cents per toy.

26

27   [1] Plaintiff's Amended Complaint asks the Court to declare that McDonald's current practices
violate California law.  It is unclear whether Plaintiff is seeking to prevent McDonald's from

28   including toys in Happy Meals in California, but it is assumed for purposes of removal that
Plaintiff seeks such relief.

25.     As noted previously, through its subsidiaries, McDonald's owns and operates 11% of the restaurants in the U.S.  If McDonald's were enjoined from including toys in Happy Meals in California, McDonald's would incur 11% of an added cost of $7.7 million per year, or $847,000 per year.

26.     It is a commercial reality that McDonald's would have to bear its portion of these additional costs for at least two years after any injunction was entered.  These costs over two years would total an additional $1.69 million.

27.     In addition to the immediate and fixed costs related to toys that McDonald's would have to incur if it were enjoined from including toys in its California Happy Meals, McDonald's would suffer additional unique costs associated with the inability to use the ███████ toys which were destined for California.  For example, it would have to destroy the year's supply of toys.

28.     The additional costs of destroying a year's worth of toys would cost McDonald's and its franchises $1.82 million.  Once more, through its subsidiaries, McDonald's owns and operates 11% of the restaurants in the U.S.  Therefore, it would bear $200,000 of this cost related to destroying the toys.

29.     The toy-related costs to McDonald's of granting the requested relief is at least ███████

## CONCLUSION

30.     In conclusion, if a court were to grant to the relief requested in the Amended Complaint, the costs to McDonald's would exceed $5 million.

31.     To comply with the injunction, it would cost McDonald's ███████ in advertising costs and at least ███████ in toy costs, rendering the total cost of compliance ███████.

I swear under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

**[SIGNATURE ON NEXT PAGE]**

Page 18 of 18 received on 2/2/2011 1:02:51 PM [Eastern Standard Time] on server RFAXATL51.

1     I swear under penalty of perjury under the laws of the United States of America that the

2    foregoing is true and correct. Executed this 2nd day of February 2011, at Goleta, California.

3

4

5

6    LEGAL02/32444401v1                             Peter Sterling

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28